## NATIONAL LABOR RELATIONS BOARD, Petitioner,

### v.

## KIAWAH ISLAND COMPANY, LTD., Respondent.

### No. 80–1181.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1980.

Decided May 27, 1981.

**2.** *Cotter v. Harris*, 642 F.2d 700 at 709 (3d Cir. 1981).

Winter, Circuit Judge, concurred in part and dissented in part and filed opinion.

Marlys E. Patrick, S. Portland, Me. (William A. Lubbers, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Vivian A. Miller and Steven M. Fetter, Washington, D. C., on brief), for petitioner.

John D. Marshall, Washington, D. C. (Donald G. Mayhall, Branch & Swann, Atlanta, Ga., on brief), for respondent.

Before WINTER, SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its decision and order that the respondent, Kiawah Island Co., Ltd., violated sections 8(a)(1)· and 8(a)(3) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1), (3),[1] by interfering with their employees' rights to organize a union and by terminating two kitchen employees who were responsible for initiating the organizational effort at the Company's resort.

We grant enforcement of the Board's order finding an 8(a)(1) violation, but conclude that there is not substantial evidence to sustain the Board's finding of an 8(a)(3) violation. We, therefore, deny enforcement of that part of the Board's order.

---

1. Sections 158(a)(1) and (3) provide:
    (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

I.

Kiawah operates a 10,000-acre resort on Kiawah Island, South Carolina. It includes a 160-room oceanfront hotel, the Inn, which contains restaurant facilities. The Inn commenced operation in May 1976, and from the beginning had difficulty with maintaining proper standards of cleanliness in its food storage, preparation and service facilities. The State of South Carolina, through its Health and Environmental Agency, makes regular inspections of such facilities. There are three standard ratings: "A," "B" and "C". A grade of "C" indicates an unsatisfactory inspection and denotes an inferior operation.

The first inspection of the Inn's kitchen was made on June 1, 1976, immediately before the facility opened, and resulted in a "C" rating. At a follow-up inspection on June 4, an "A" rating was awarded. A "C" rating was again received on July 20, an "A" rating on July 27, and a "C" rating on November 30.[2]

Kiawah made a number of personnel changes from June 1, 1976 through the early part of 1977, in an attempt to rectify the situation and maintain a satisfactory rating for the food facilities. The general manager, Forrest, established a regular kitchen cleanup crew on June 2 or 3, with James Hymes as supervisor, and instituted a crash cleaning program. After the July 20 "C" rating, Forrest was discharged and the chief night auditor was assigned to retrain the kitchen cleaning crew and develop procedures for them to follow. After the November 30 "C" rating, the vice-president of resort operations, Taylor, concluded that the separate kitchen cleanup crew, with Hymes as a working foreman, was inefficient and turned the total responsibility for cleanliness over to the chef, Charvet. Hymes was demoted to a nonsupervisory leadman position and his pay was reduced. Shortly thereafter, Hymes and Robert Murray (the latter had been employed as a

member of the cleaning crew since November 3), contacted a representative of the Union.[3] Hymes and Murray were given authorization cards and ultimately obtained signatures from 40–50 coworkers.

Although there is some conflict in the testimony, it is apparent that Kiawah became aware of the Union's attempts to organize in early December and contacted labor counsel for advice in countering the union effort. On January 22, 1977, the senior vice-president assembled the employees and delivered a speech which contained, among other things, the following statements: "[I]f you sign that card, I think you will be sorry" and "The company is not going to let the union mess things up without a fight. I can tell you right now that the company will fight the union just as hard as the law permits and that is pretty darn hard. Unfortunately for you, when a company and a union get into a fight it is the employees who get hurt." The Administrative Law Judge and the Board found that this action threatened employees with retaliatory action for exercising their section 7[4] rights.

On March 7, 1977, the Union filed a representation petition with the Board. The following week, Kiawah held a meeting of its supervisors and instructed them to explain to the employees the benefits they were currently being provided, that a union was unnecessary and that the Company was opposed to it. Supervisors Cheshire and Clifton met with employee Haywood on or about March 22, 1977, to disseminate the Company's antiunion message. Haywood asked Cheshire why she had not received a previously promised raise. She testified that he replied, "on account of the union," and that the increase would be considered a "bribe" because the Union had filed a representation petition.

On April 25, 1977, supervisor Smythe told employee Cohen he "didn't know if [Cohen]

---

**2.** The Company was permitted to post a "B" rating following this inspection, however.

**3.** Hotel, Motel, Restaurant Employees and Bartenders Union, Local 270, Hotel & Restaurant

Employees & Bartenders International Union, AFL–CIO.

**4.** 29 U.S.C. § 157.

was involved with the union or not . . . but the union probably could get [the employees] in trouble." Cohen then asked Smythe about a raise he was supposed to get; Smythe responded that Cohen had not received it because the Union had them "in a hole." Sometime after April 25, Smythe approached a group of employees. When one said something about the Union, Smythe replied, "You might get a lot of people in trouble." The Administrative Law Judge found all these actions by Kiawah to have threatened employees in violation of 8(a)(1).

## II.

█ In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969), the Supreme Court expressed a now familiar rule on section 8(a)(1) coercion:

> Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

It is for the Board to make these determinations and where substantial evidence supports its conclusions an appellate court will not substitute its own judgment for that of the Board. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357 (4th Cir. 1969).

█ Here, Kiawah, after consulting with counsel, exhibited an explicit antiunion animus in its activities countering the Union's attempts to organize. Considering all the evidence, there is substantial evidence that the vice-president's speech and the contacts made by supervisors had the effect of coercing the involved employees from exercising protected rights. We therefore grant enforcement to that part of the Board's order relating to the 8(a)(1) violations.

## III.

█ We reach a different conclusion, however, with respect to the Board's findings that Kiawah discharged employees Hymes and Murray for their union organizational activities in violation of sections 8(a)(3) and (1) of the Act. We therefore deny enforcement of that part of the Board's order.

It is true Kiawah knew of the Union's attempt to organize when it fired Hymes and Murray. It is also true, however, that valid reasons for their discharges existed prior to, and independent of, any union activities. After the initial inspection of the Inn's food facilities, which resulted in a "C" rating, Kiawah's vice-president of resort operations, Taylor, reprimanded the general manager, Forrest. Forrest instituted a crash program to correct the deficiencies, established a regular kitchen cleanup crew and promoted a housekeeping department employee (Hymes) as supervisor. Despite these actions, however, Kiawah subsequently received "C" as well as "A" ratings and continued its efforts to improve.

After the second "C" rating was received (July 20, 1976), Forrest was discharged. Taylor temporarily assumed responsibility for managing the Inn, and the chief night auditor was assigned to retrain the kitchen cleaning crew and develop procedures for them to follow. On November 30, 1976, an inspection by the state agency again resulted in a "C" rating. Sometime between November 30 and December 2, chef Charvet recommended that Hymes and Murray be terminated. On December 2, Taylor sent a memo to certain supervisors expressing his feeling that the November 30 "C" rating was totally unacceptable and "in direct correlation to management effectiveness." He concluded that the separate kitchen cleanup crew was not going to work and ordered Charvet to assume total responsibility for the kitchen's cleanliness.

Charvet's recommendations that Hymes and Murray be terminated were submitted to food and beverage director Scott and personnel director Smith; Scott rejected the recommendations, deciding to give them another opportunity to improve their job performance, but demoted Hymes to a non-supervisory position.

Although Hymes and Murray contacted the Union shortly after Hymes' demotion, and the Company soon became aware of their organizational efforts, Kiawah continued its efforts to obtain and maintain satisfactorily clean food facilities. Scott conducted an inspection of the kitchen facilities on February 18 and found them unsatisfactory in terms of cleanliness. Hymes and Murray, who apparently worked the evening before the inspection, were suspended for three days. The executive vice-president, Brumley, inspected the kitchen on February 26, as part of a series of inspections of all departments, and found the kitchen to be unclean. He sent a memo with specific inspection observations to Scott. Based on this, Hymes and Murray were terminated for unsatisfactory performance; the manager of the dining room was demoted; the third member of the cleaning crew and two dishwashers were issued disciplinary warnings; and Scott was reprimanded.[5] Subsequent to Hymes and Murray's discharges, Kiawah continued to receive unsatisfactory ratings from the South Carolina Health and Environmental Agency, and Charvet, Scott, a subsequent food and beverage director and a subsequent chef were terminated.

■■■ A discharge, of course, violates the Act only if precipitated by a discriminatory motive or unlawful intent. *NLRB v. Consolidated Diesel Electric Co.*, 469 F.2d 1016 (4th Cir. 1972). Where the evidence can support inferences of both discriminatory and nondiscriminatory reasons for the discharge, the rule announced in *Neptune Water Meter Co. v. NLRB*, 551 F.2d 568 (4th Cir. 1977), still controls in this circuit.[6] "It is settled in this circuit, and most of the others, that 'it is enough [to find an unfair labor practice] that a discriminatory motive was a factor in the employer's decision.'" *Id.* at 569 (footnote omitted).

*Neptune* emphasizes, however, that it need be determined that the improper motive is a factor in the discharge.

> In the end after weighing all relevant factors including particularly the gravity of the offense, an unfair labor practice may be found only if there is a basis in the record for a finding that the employee would not have been discharged, though he may have been subjected to a milder form of punishment for the offense, except for the fact of his union activity.

*Id.* at 570; *American Thread Co. v. NLRB*, 631 F.2d 316, 320 (4th Cir. 1980). *See NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988 (4th Cir. 1979).

■■■ Language in our cases indicates a "shifting" burden of proof where there is evidence of both discriminatory and valid reasons for the discharge. *See, e. g., Appletree, supra.* If initial evidence of union membership and employer animus is unrebutted by evidence of proper employer motive, the Board may well rest on that evidence to find an 8(a)(3) violation. The introduction by the employer of evidence of proper motive casts a greater responsibility on the Board—to weigh all the evidence; and, in this sense, a shifting burden concept might be useful. More accurately, however, the burden is on the General Counsel throughout to show that a discriminatory motive retaliative against the exercise of protected activity was a factor for the discharge. *NLRB v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804 (4th Cir. 1975).

---

5. There was conflicting evidence on who terminated Hymes and Murray and the reasons given them. The Board made several credibility findings supporting the testimony of Hymes and Murray. We make no determination as to the validity of these findings; assuming they are valid, however, we still find no substantial evidence to support the finding that Hymes and Murray were discharged for their union activities.

6. A suggestion for rehearing *en banc* was denied, with Judges Russell, Widener and Hall dissenting.

In weighing conflicting evidence of good and bad employer motive, we have directed the Board to find a violation if the bad motive was a "factor." *American Thread, supra; Neptune, supra.* We have also directed the Board to "find and identify 'an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one,' that is, why he rejected the 'supportable' cause and 'chose a cause intended to discourage union activity.'" *Appletree,* 608 F.2d at 993. Any apparent tension between the *Neptune* language and that of *Appletree* is eased when the basic proof structure under the NLRA is considered. An appellate court must affirm the Board-determined unfair labor practices when they are supported by substantial evidence. *Universal Camera Corp., supra; Owens-Corning Fiberglas Corp., supra.* In determining whether there is substantial evidence to support a Board finding that bad motive was a "factor" in an employment discharge, we, of course, must look to all the evidence, including the employer's evidence of proper motivation. Should the Board have failed to identify and weigh the latter evidence, it will have failed its mission as a fact-finder.

This does not mean that an employer *qua* employer is entitled to any greater evidentiary consideration than an employee *qua* employee. Giving evidentiary preference to either in this context would be contrary to the purpose of the Act. But, as stated in *Neptune, supra,* mere union membership does not insulate a worker from being discharged for just cause—there must be evidence demonstrating it was a factor. Likewise, an employer's antiunion animus in and of itself does not destroy his right to discipline for just cause—it must have been a reason for the discharge. If both good and bad motives are involved, the evidence must demonstrate why the good motive was not the sole reason for the discharge. Where the employer has a legitimate business motive but would not have discharged the employee for that reason except for his union membership or antiunion animus on the part of the employer, the discharge is unlawful. *American Thread, supra; Neptune, supra.*

A mere declaration by the Board that the reason advanced for the discharge was pretextual, however, is not sufficient to overcome a showing of bona fide reasons by an employer. *Firestone Tire & Rubber Co. v. NLRB,* 539 F.2d 1335, 1337 (4th Cir. 1976). The "burden cannot be sustained by evidence that rises no higher than conjecture or suspicion." *Appletree,* 608 F.2d at 993. The ultimate reason, perhaps overly simply stated, is that a plaintiff or complainant has the affirmative burden of proving his case.

Kiawah presented cumulative and uncontradicted direct evidence that Hymes and Murray were fired for considerations having nothing to do with the Union. Kiawah experienced continued difficulty in maintaining satisfactorily clean food facilities immediately prior to its opening and continuing long after Hymes and Murray were discharged. It made continuous attempts to rectify the problems. It disciplined and discharged numerous employees, both supervisory and nonsupervisory. It expressed disapproval with the quality of the performances of Hymes and Murray preceding their contact with the Union.

As we said in *Neptune, supra* :

The rule is that if the employee has behaved badly it won't help him to adhere to the Union, and his employer's anti-union animus is not of controlling importance.

*Id.* at 570.

Direct evidence strongly inferring that Kiawah was motivated by sound business reasons, so completely overcomes the circumstantial evidence of the timing of the discharges cited by the Board that the latter cannot be considered substantial. The union membership of Hymes and Murray alone does not serve to shield them from discharge for just cause, and under these circumstances their employer's antiunion animus does not control.

We conclude, therefore, that the order of the Board finding that Hymes and Murray's discharges were motivated by their union activities is not supported by substantial evidence.

*ENFORCEMENT GRANTED IN PART AND DENIED IN PART.*

WINTER, Circuit Judge, concurring and dissenting:

While I concur in the majority's conclusion that substantial evidence supports the Board's finding of § 8(a)(1) violations, I think that substantial evidence in the record as a whole also supports the Board's conclusion that Kiawah discriminatorily discharged Hymes and Murray in violation of § 8(a)(3) of the Act because of their efforts to bring about union representation at the Inn. I therefore respectfully dissent from that portion of the majority's opinion setting aside the finding of a § 8(a)(3) violation and declining to enforce the portion of the Board's order based thereon.

The record reflects the difficulties experienced by Kiawah in maintaining health standards in its dining facilities. The essential question before us is whether those difficulties were the sole motivation for Kiawah's discharge of Hymes and Murray, or whether the Board has met its burden of demonstrating that an unlawful discriminatory motive was a factor in the decision. *See Neptune Water Meter Co. v. NLRB*, 551 F.2d 568, 569–70 (4 Cir. 1977). The direct evidence in the record of discriminatory motive is relatively slight, but, to my mind, the circumstantial evidence is sufficiently compelling to support the Board's conclusion.

The discharges did not occur until March 2, 1977, over three months after the last state health inspection, conducted on November 30, 1976, but only thirty-nine days after Kiawah began its campaign to forestall union representation at the Inn. The majority apparently agrees that there is substantial evidence to support the Board's finding that Kiawah was well aware of unionizing activities. As I view the record, Hymes and Murray were the prime movers to organize the employees and Kiawah was well aware of their role. In any event, the state inspector testified that his November 30 review of the Inn's kitchen revealed deficiencies not only in the cleanliness of the kitchen and its equipment but also in the handling of food, an activity for which Hymes and Murray had no responsibility. Even subsequent to the discharges of Hymes and Murray the state health authorities continued to find serious deficiencies in the Inn's kitchen operations, and Kiawah offered evidence that it fired the Chief Chef, the Food and Beverage Director, and their respective successors as a result. Their terminations are entirely consistent with the conclusion of Kiawah vice-president Taylor's memorandum responding to the November 30 inspection in which he stated that: "The grade of the restaurant is in *direct* correlation to management effectiveness." But Kiawah's discharges of Hymes and Murray cannot be said to be entirely consistent with the memorandum, because Kiawah significantly terminated only Hymes and Murray among its kitchen employees despite the continuing health problems with the kitchen operations. Except for the discharges of Hymes and Murray, the evidence shows that Kiawah held its kitchen *managers* accountable for the deficiencies. It is noteworthy that the discharges of Hymes and Murray did not lead to any improvement in the kitchen cleaning, despite the testimony in the record suggesting that Hymes and Murray performed their tasks poorly.

The immediate circumstances of the discharges of Hymes and Murray appear particularly suspect when viewed in light of all of the evidence of Kiawah's efforts to upgrade sanitary standards in the Inn's kitchen and its campaign against union representation. Kiawah restructured its kitchen cleaning operations in early December 1976, relieving Hymes of his supervisory duties and allegedly placing full responsibility for cleanliness with Chief Chef Charvet. Kiawah clearly did not hold Hymes responsible for its previous difficulties with the state health authorities. Although Charvet apparently sought to terminate Hymes, Kiawah officially stated that its reason for the demotion was managerial error in establishing the supervisory position and that Hymes would be considered for a comparable post were one to become available. After Kiawah became aware of pro-union activity among the employees at the Inn, it established a formal Disciplinary Action Policy on January 25, 1977, which, according to the company, merely documented the "essence" of prior disciplinary "practice." The policy provided for suspension and possible discharge in the event of repeated

reprimands. Hymes and Murray never received a reprimand. Kiawah first suspended them and eventually discharged them.

On February 16, Kiawah issued its first disciplinary suspension to Hymes for allegedly falsely punching in Murray's time card on February 12 when he was absent. It took this action despite the fact that Hymes not only denied this infraction but notified a company supervisor of Murray's absence at the time and admitted a day later that he left work during the shift to bring Murray to work. Moreover, Kiawah disciplined him without investigating the possibility that another of the four or five employees in the area punched Murray's card.

On February 18, after an inspection of the kitchen by the Food and Beverage Director, Kiawah suspended Hymes and Murray for three days because of the unsatisfactory cleanliness of the kitchen. It took this action solely against Hymes and Murray without disciplining the apparently absent third member of the night-cleaning crew, one Solomon Stanley, despite the inspection report's notations of "accumulations" of grease and dirt. In addition, Chief Chef Charvet attributed other deficiencies noted in the report to dishwashers and cooks who were similarly not disciplined. Finally, the suspension was the first disciplinary action taken by Kiawah against cleaning employees after seven months of problems. Previously, these problems had been addressed on an ad hoc basis and corrected. The employees had received no disciplinary warnings and Kiawah conceded that the problems noted in the February 18 inspection were of the same character as problems previously noted.

Another inspection was conducted by another Kiawah officer on February 26, and it revealed unsatisfactory conditions in the kitchen. On March 2, Kiawah discharged Hymes and Murray, but the third night-cleaning crew member, Stanley, merely received a warning, as did two dishwashers.

These circumstances, demonstrating a gross disparity of treatment between Hymes and Murray and other kitchen employees responsible for cleaning, amply support the Board's conclusion that Kiawah's asserted motivation for the discharges was a pretext and that in fact the disciplinary sanctions against Hymes and Murray which were begun in February were pursued to the point of discharge because of their active solicitation of employees of the Inn on behalf of the union. As we explained in *Neptune Meter*, the rule articulated in *Firestone Tire and Rubber Co. v. NLRB*, 539 F.2d 1335, 1337 (4 Cir. 1976), requiring the Board to find "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one . . .":

> is not to be read to mean that there is a dichotomy between good and bad reasons. It does not change the rule in this circuit that discriminatory motivation need be only *a* factor in the discharge. Rather, [*Firestone*] made clear that where there is evidence of a proper motive for dismissal, the Board's mere characterization of the Company's assigned reason as "pretextual," without citation of evidence indicating invidious purpose, will not suffice.

551 F.2d at 569. I think that substantial evidence in the record supports the Board's finding that Kiawah would not have singled out Hymes and Murray for the extraordinary disciplinary action of discharge except for their pro-union activity. I accordingly would enforce the Board's order to reinstate these two men.