**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INSTRUMENT CORPORATION OF AMERICA, Respondent.**

No. 82–1408.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided Aug. 4, 1983.

Lawrence S. Wescott, Baltimore, Md. (Peter E. Keith, Venable, Baetjer & Howard, Baltimore, Md., on brief), for respondent.

Frances H. O'Connell, Washington, D.C. (Allison W. Brown, Jr., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Gen. Counsel, Washington, D.C., on brief), for petitioner.

Before RUSSELL and ERVIN, Circuit Judges, and FIELD, Senior Circuit Judge.

ERVIN, Circuit Judge:

In this case, the National Labor Relations Board seeks enforcement of its order directing Instrument Corporation of America ("ICA" or "the Company") to cease and desist from practices prohibited under section 8(a)(1) and (3) [1] of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3), and to reinstate, with back pay, five former employees discharged allegedly for union

---

1. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1976). Section 157 provides in part that "employees shall have the right to self-organization, to form, join or assist labor organizations ... and to engage in other concerted activities for ... other mutual aid or protection...." 29 U.S.C. § 157 (1976).

Section 8(a)(3) makes it an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" by "discrimination in regard to hire or tenure of employment or any term or condition of employment...." 29 U.S.C. § 158(a)(3) (1976).

organizing activities. An administrative law judge for the NLRB found that ICA wrongfully discharged Lynn Brown, Frank Ferrell, Fay Gray, Grace Harry, and Richard Schucker for engaging in protected activities. A panel of the NLRB affirmed, adopting the opinion of the ALJ. On the basis of substantial evidence in the record which sustains the ALJ's findings, we now grant enforcement as to Brown, Ferrell, Gray, and Harry. However, we deny enforcement as to Schucker.

## I.

Instrument Corporation of America manufactures electronic stencil cutters. The Company's facility in Baltimore is divided into three departments—mechanical assembly, electrical assembly, and testing—each with its own supervisor. The physical layout of the facility fosters intermingling of all employees and supervisors: everyone works in a single room which also serves as a common lunch area, and the adjacent parking lot is used by employees and supervisors alike.

During the period relevant to this case the Company employed around twenty-five production and maintenance employees. Up until May 13, 1980, Lynn Brown and Frank Ferrell worked as mechanical assemblers. Fay Gray and Grace Harry were employed in the electrical assembly department. Richard Schucker was a tester until his dismissal on May 16, 1980.

In the fall of 1978, a group of ICA employees became disenchanted with management policies. Fay Gray suggested that the local chapter of the International Brotherhood of Electrical Workers ("IBEW") be contacted. Soon thereafter, three employees called on Local 24 of the IBEW and obtained union authorization cards. The three were Frank Ferrell, Robert Drummond, and Paul Bosnick, Jr., the son of ICA's manufacturing manager. Bosnick la-

ter told his father that he, Ferrell and Drummond had visited Local 24.

IBEW Local 24 conducted an organizing drive at ICA during the last few months of 1978 and managed to secure enough authorization cards to file a petition for representation with the NLRB on January 15, 1979. Pursuant to a stipulation with the Company, an election was set for March 23, 1979.

During the nine-week campaign that followed, employees Lynn Brown, Ferrell, Gray, Harry, and Schucker attended several union rallies at which plant supervisors were also present. These meetings were held after hours; employees desisted from campaign activities—including the distribution of union literature and the wearing of partisan buttons—during the work day.

Opposition to the union was personally led by the president of the Company, J. David Bryan. He wrote several open letters to employees warning of the drawbacks of unions. He held a grievance session for employees at which Lynn Brown, Ferrell, Gray, and Schucker voiced dissatisfaction over company policies. In management meetings Bryan instructed supervisors to speak out against the union with employees and to report back to him with information on the campaign. No evidence demonstrates, however, that Bryan specifically solicited the names of union partisans from supervisors.

Three witnesses for the NLRB testified at the proceedings below that Bryan threatened to "farm out" the Company's contracts rather than "answer to a union." This statement was alleged to have been made at a management meeting attended by supervisors Mary Brown and Daisy Wenk. Mary Brown reported the comment to Lynn Brown,[2] and Wenk relayed it to Fay Gray. The testimony of Mary Brown, Lynn Brown, and Gray pertaining to Bryan's threat is contradicted by Paul Bosnick, ICA's manufacturing manager, who was

---

**2.** Mary Brown is the mother-in-law of Lynn Brown. Mary Brown was laid off on May 13, 1980, along with her daughter-in-law, Frank Ferrell, Fay Gray, and Grace Harry. Mary Brown was the only supervisor to be terminat-

ed and her dismissal is not at issue in this enforcement proceeding since supervisors are not covered by the National Labor Relations Act. Mary Brown did testify against the Company in the hearing below.

present at the meeting where the statement was allegedly made, and Bryan himself. Both men claim no such comment was made.

In the March 23 election, the IBEW was defeated by two votes, 14–12. Following the election, employee Frank Ferrell requested a meeting with Bryan to discuss wage policies. At the meeting, Ferrell and Lynn Brown registered complaints over prevailing practices at the Company. Three other employees were also present at the meeting who are still employed by the Company.

Eleven months later in February, 1980, ICA suffered a severe economic setback when the purchaser of 90% of the Company's product, Gestetner Co., demanded modification of the supply contract between them. Bryan agreed to a suspension of shipments of stencil cutters for the months of March through May, followed by normal shipments in July and August, followed by reduced shipments for the duration of the year. From December 31, 1979 to April 31, 1980, ICA's accounts receivable fell by 70%, and its cash on hand dipped by 37%.[3] Faced with these difficulties, Bryan claims to have met with manufacturing manager Paul Bosnick in March, 1980 for the purpose of paring the workforce by 15%. Although at least one employee had been told that layoffs, if ever required, would fall according to seniority, those ultimately dismissed— Mary Brown, Lynn Brown, Ferrell, Gray, and Harry—reflected tenures of varying length at the Company. President Bryan offered economic reasons for the selection of each laid off employee;[4] the NLRB argues, of course, that it was the pro-union sympathies of the individuals tapped that motivated their dismissal.

The layoffs claimed to have been decided upon in March were not implemented right away. Bryan maintains this is because he hoped to find alternative purchasers during an impending trip to Brazil and Venezuela that would avoid the necessity of layoffs.

In April, while Bryan was away in South America, a new union organizing drive was begun. Employees Ferrell and Schucker obtained authorization cards from Local 24 which they distributed in the plant parking lot to their fellow workers before and after hours and during lunch. On April 28, the union filed a new petition for representation.

Bryan returned to Baltimore on May 7, his quest for new business having proved fruitless. On May 8, he learned of the new petition for representation. On May 12, Bryan, who had entered the hospital for surgery, directed the permanent layoffs of Mary Brown, Lynn Brown, Ferrell, Gray, and Harry. The five were dismissed on May 13.

That same day, Richard Schucker walked off his job at lunchtime, failing to return until 5:00 P.M. Schucker, who had been employed at ICA for one year and eight months, had a history of absenteeism. He even received a notice of dismissal in January, 1980, on account of his spotty attendance, but his job was saved when a supervisor resigned that month. Although Schucker's hours were more flexible than the assembly line workers' at ICA, he was expected to put in forty hours a week, which he had not met since January, 1980. Prior to leaving the plant on May 13, Schucker indicated to his supervisor, Robert Sikora, that he intended to take some vacation time that week. However, he did not tell Sikora that he planned to take off that afternoon. When Schucker reappeared at 5:00 P.M., Sikora demanded an explanation and apparently agreed to count Schucker's afternoon recess as vacation time. President Bryan felt differently, however, for when he learned three days later of Schucker's conduct, he ordered that Schucker immediately

---

3. The Company somewhat recovered its position in the ensuing months.

4. According to Bryan, Mary Brown was laid off because Bryan and Bosnick felt other supervisors less highly paid could cover her duties. Ferrell and Lynn Brown performed functions that could be accomplished by lower paid workers. Gray and Harry each performed one specialized function which it was felt could be handled by more versatile employees.

be fired. Sikora carried out this order on May 16. Schucker had been a vocal union sympathizer, and so he asked Sikora whether his dismissal was prompted by his union activities. Sikora replied it was not.

According to Bryan, the policy at ICA was that all layoffs were permanent, so that if business improved the Company could choose between hiring new employees at base wage rates or rehiring laid off employees at their former wage levels. In the months following the May layoffs, several new employees signed on at ICA; none of the five discharged employees were invited to return. A summer spurt in business led the Company to subcontract work with employees at premium overtime wages.

On June 6, 1980, the second union election again brought defeat for the IBEW, this time by a margin of 10–7. Seven challenged votes were lodged, including five registered by the employees laid off in May. Due apparently to his ill health, Bryan did not play an active role in the campaign leading up to June 6.

Shortly after the dismissals at issue, the union filed unfair labor practice charges with the National Director of the NLRB. Eventually, an administrative law judge found that the dismissals of Lynn Brown, Ferrell, Gray, Harry, and Schucker were largely motivated by anti-union animus, not valid business justifications. This is the ruling we are asked to review.

II.

In opposing the NLRB's petition for enforcement of its order, ICA contends that the administrative law judge misallocated the burdens of proof, forcing the Company to prove it would have discharged the employees even in the absence of protected conduct,[5] rather than requiring the Board to show that union activity was a "but for" cause of the dismissals.

A close reading of the ALJ's opinion discloses *no misassignments of proof.* In this circuit, "the burden is on the General Counsel throughout to show that a discriminatory motive retaliative against the exercise of protected activity was a factor for the discharge.". *NLRB v. Kiawah Island Co., Ltd.,* 650 F.2d 485, 490 (4th Cir.1981). *See also Neptune Water Meter Co. v. NLRB,* 551 F.2d 568, 569 (4th Cir.1977). This burden requires General Counsel to do more than present evidence of union membership or concerted activities where the employer offers a valid reason for employee dismissals. *Kiawah Island,* 650 F.2d at 491. When confronted with evidence of a legitimate business motive, General Counsel must prove by a preponderance of the evidence that union antipathy did actually play a part in the decision to discharge employees.[6] *Id.* In deciding the factual question of

---

**5.** ICA's argument that it could not be assigned the burden of proving it would have discharged the employees even if they had not sided with the union is nullified by the recent pronouncement in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). In *Transportation Management,* the Supreme Court ended two years of controversy engendered by the case of *NLRB v. Wright Line,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), ruling unanimously that once General Counsel proves by a preponderance of the evidence that a discharge was based in whole or in part on anti-union animus, the employer will be held to have violated section 8(a)(1) and (3) of the National Labor Relations Act unless the employer can prove as an affirmative defense by a preponderance of the evidence that the worker would have been fired even if he or she had not been involved with the union. This holding is consistent with our long-standing rule, discussed in the text *infra,* that to establish a violation of section 8(a)(3), General Counsel has the burden "throughout to show that a discriminatory motive retaliative against the exercise of protected activity was a factor for the discharge." *NLRB v. Kiawah Island Co., Ltd.,* 650 F.2d 485, 490 (4th Cir.1981). In this case, substantial evidence indicates that the General Counsel met its burden of proving that anti-union animus was a factor in the dismissals and that ICA failed to show the same action would have taken place even in the absence of the protected activity.

**6.** We acknowledge our precedents applying different language to the inquiry into motive. We have often held that where the employer asserts proper business justification for employee layoffs, the Board must find "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one and ... present a substantial basis of believable evidence pointing toward the unlawful one."

motive, it is not enough for the Board simply to declare that the reasons offered by the employer were pretextual; the Board must advert to tangible evidence demonstrating why the good motive was not the sole reason for the discharge. *Id.* It goes without saying that because the task of proving an employer's motive is difficult, the Board may rely on circumstantial evidence presented by General Counsel in establishing that anti-union animus figured in the employer's actions, provided that the circumstantial evidence is substantial and the inferences drawn therefrom reasonable.

We believe that the ALJ correctly applied these rules of law in finding that ICA acted, at least in part, out of anti-union animus in discharging Brown, Ferrell, Gray, and Harry. Nowhere does it appear in the decision of the ALJ that General Counsel was relieved of the ultimate burden of proving that a discriminatory motive was a factor for the discharges. And, since the question of motive is one of fact, we are limited on review to an inquiry into whether substantial evidence exists to support the ALJ's findings. As discussed below, we are satisfied that, taking the evidence as a whole, the ALJ (and the Board) could reasonably conclude that anti-union hostility played a part in the terminations of Brown, Ferrell, Gray and Harry.

### III.

On review of this petition for enforcement, we must decide whether, based on the entire record before us, substantial evidence sustains the Board's conclusion that the dismissals of Lynn Brown, Ferrell, Gray, Harry, and Schucker were partly or wholly motivated by the purpose of discouraging union activities at ICA. *Jeffrey Manufacturing Division, etc. v. NLRB,* 654 F.2d 944, 948 (4th Cir.1981). The question of motive is one of fact, and the Board's determination will not be overturned if its conclusions drawn from credibility findings and inferences from the evidence are reasonable. *NLRB v. Comgeneral Corp.,* 684 F.2d 367, 369 (6th Cir.1982). Where the Board's conclusions are reasonable, it does not matter that we might have reached a different result had we been the factfinders. *Jeffrey Manufacturing Co.,* 654 F.2d at 948. Of course, as we have stated before, the mere fact that a union partisan was discharged during a union campaign does not make out a violation of section 8(a)(3) if a supportable cause for the dismissal appears. *Id.* Furthermore, mere speculation as to the Company's real motives "register[s] no weight on the substantial evidence scale." *TRW, Inc. v. NLRB,* 654 F.2d 307, 312 (5th Cir.1981).

■ Having examined the record, we are satisfied that with regard to Lynn Brown, Ferrell, Gray, and Harry the evidence supports the Board's conclusion that ICA acted at least in part out of malice toward the

---

*American Manufacturing Association, Inc. v. NLRB,* 594 F.2d 30, 36 (4th Cir.1979), *quoting Firestone Tire & Rubber Co. v. NLRB,* 583 F.2d 1268, 1273 (4th Cir.1978). *See also McLean Trucking Co. v. NLRB,* 626 F.2d 1168, 1169–70 (4th Cir.1980); *NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988, 993 (4th Cir.1979). Admittedly, some superficial discrepancy appears between this analysis and our long-standing rule that anti-union animus need only be shown to have been a factor in employee layoffs. But as we wrote in *Kiawah Island,*

> [a]ny apparent tension between the *Neptune* language and that of *Appletree* is eased when the basic proof structure under the NLRA is considered. An appellate court must affirm the Board-determined unfair labor practices when they are supported by substantial evidence.... In determining whether there is substantial evidence to support a Board find-

ing that bad motive was a "factor" in an employment discharge, we, of course, must look to all the evidence, including the employer's evidence of proper motivation. Should the Board have failed to identify and weigh the latter evidence, it will have failed its mission as a fact-finder.

650 F.2d at 491 (citations omitted). We note also that the language of *American Manufacturing Association* and *Appletree,* while useful in the evaluation of employer justifications that smack of sham or pretext, is less apt where the evidence genuinely appears to make out the co-existence of a lawful motivation and an unlawful one. *See Neptune Water Meter Co.,* 551 F.2d at 569. We decline to consider the impact of *NLRB v. Transportation Management,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), *see* n. 5 *supra,* on *American Manufacturing Association* and *Appletree.*

union, and that the business justification advanced by the Company was pretextual or, at best, was not the sole reason for the layoffs. The dismissals came only days after Bryan learned of a petition for union representation on May 8, 1980. All of the employees discharged on May 13 had demonstrated varying degrees of discontent with management and sympathy with the union. Lynn Brown, Ferrell, Gray, and Harry were each vocal with their grievances throughout 1979.[7] All four employees dismissed on May 13 had unblemished work records. This contrasts with cases cited by ICA such as *NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 992 (4th Cir. 1979) (no violation of section 8(a)(3) where employer terminated four union sympathizers with poor work records), *NLRB v. Kiawah Island Co., Ltd.*, 650 F.2d 485, 491 (4th Cir.1981) (company justified in firing employee responsible for poor sanitation results; no violation of section 8(a)(3)), *Burlington Industries, Inc. v. NLRB*, 680 F.2d 974, 976–77 (4th Cir.1982) (no violation of section 8(a)(3) where previously warned employee committed repeated infractions of company rules), and *NLRB v. Burns Motor Freight, Inc.*, 635 F.2d 312, 314 (4th Cir. 1980) (truck driver laid off after receiving speeding citations; enforcement of section 8(a)(3) order denied). Nor did the layoffs fall according to seniority. Although no direct evidence appears that ICA management knew the names of union partisans, ample circumstantial evidence permits that inference. Only about twenty-five persons comprised the work force at ICA during 1979 and 1980. According to the credited testimony of Mary Brown, supervisors were ordered to report to management on union activities during the 1979 campaign. Lynn Brown, Ferrell,[8] Gray, and Harry made no secret of their displeasure with management, even in Bryan's presence.[9] The smallness and openness of the plant further made it unlikely that union allegiances would remain secret. ICA's official policy of considering all layoffs to be permanent nevertheless held out the possibility that experienced senior people would be rehired, yet not one of the four employees laid off on May 13 was called back when positions came open as the economic picture brightened. This is additional evidence of improper motive.

In the proceedings below the Company countered this evidence of unfair labor practice with assertions of business necessity. The Company did suffer significant economic injury in the winter of 1980. Reasons were offered for the particular selection of each employee discharged. The Company points out that Mary Brown, who was dismissed along with the four complainants on May 13, was a supervisor ineligible to vote in a union election, while Lynn Brown, who did not vote for the union in 1979, was also terminated. The Company also notes that several employees who evidently voted for the union in 1979 were kept on the work force. One known union activist, Robert Drummond, was even promoted to supervisor.

We are unable to say that the Board unreasonably found this evidence insuffi-

---

**7.** The Company argues that events occurring more than six months prior to the filing of the employees' complaint with the NLRB in 1980 cannot be considered in assessing ICA's knowledge of union sympathizers. *See* 29 U.S.C. § 160(b) (1974). We reject this position. In *Local 1424, IAM v. NLRB*, 362 U.S. 411, 416–417, 80 S.Ct. 822, 826–827, 4 L.Ed.2d 832 (1960), the Supreme Court held that "where the occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices ..., earlier events may be utilized to shed light on the true character of matters occurring within the limitations period." Here, the dismissals came well within the six-month limitations period under circumstances suggesting a violation of section 8(a)(3). The events of 1979 were admissible to shed light on ICA's motive for discharging the five employees. *See Darlington Manufacturing Company v. NLRB*, 397 F.2d 760, 769 (4th Cir.1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

**8.** The Company does not dispute that it had knowledge of Ferrell's union activity, since Paul Bosnick, Jr. told his father that Ferrell had helped obtain union authorization cards in 1979.

**9.** However, Lynn Brown did not vote for the union in 1979.

cient to prove the dismissals would have occurred even in the absence of pro-union activities. *See Jeffrey Manufacturing,* 654 F.2d at 948. As noted in the opinion of the ALJ, the work force was small and the elimination of four likely votes for the union in the impending June election could have made the crucial difference where the Company's margin of victory in 1979 was only two votes. The ALJ further noted the potential chilling effect of these dismissals on others inclined to favor the union. Further undermining the Company's excuse is the ALJ's express finding that Bryan testified falsely that the dismissals were decided upon two months before being carried out. This finding is supported by a letter introduced by General Counsel dated June 19, 1980 from ICA's counsel to the Regional Director of the NLRB in which Bryan is described as selecting the individuals for dismissal between May 7 and May 9, after the second election petition was filed.[10]

Nor is the finding of anti-union animus defeated by evidence that some union activists were not fired. "[A] discriminatory motive, otherwise established, is not disproved by an employer's proof that it did not weed out all union adherents." *Nachman Corporation v. NLRB,* 337 F.2d 421, 424 (7th Cir.1964). The fact that Bryan did not fire some of the principal activists could simply mean he felt their skills too valuable to lose.

In short we find substantial evidence adduced by General Counsel to support the Board's conclusion that management knew the identities of union sympathizers, and that the May 13 layoffs were provoked at least in part by that knowledge rather than by proper business motives alone. On the weight of the evidence, the Board reason-

ably could have concluded that the Company acted out of malice toward the union, and that its business justification was not the sole reason for the discharges.

## IV.

The case of Richard Schucker stands in a wholly different light. Schucker had long been a problem employee when he was fired on May 16. Like his fellow complainants, Schucker took a prominent role in union activities, and knowledge of those activities may be imputed to the Company. However, he had also been the subject of a notice of dismissal in January, 1980 for chronic truancy from work; his job was saved only by the unexpected departure of a supervisor who left the department shorthanded. Throughout the next four months, Schucker's work attendance remained spotty; his final termination on May 16 followed closely on the heels of a five hour absence from the plant on the afternoon of May 13. The Board has not, in our view, shown that Schucker's union activities played any part in the decision to terminate him. As we stated in *Neptune Water Meter Co. v. NLRB,* 551 F.2d 568, 570 (4th Cir.1977):

> The rule is that if the employee has behaved badly it won't help him to adhere to the Union, and his employer's anti-union animus is not of controlling importance.

Accordingly, we deny enforcement of that part of the NLRB's order reinstating Schucker.

## V.

In light of the foregoing review, we grant enforcement of the Board's order re-

---

**10.** The pertinent parts of the letter, which was acknowledged by Bryan, are as follows:

It became obvious to Mr. Bryan after the meeting on February 25 [with Gestetner] that the Company faced a drastic cutback in production unless something was done to increase sales. However, he delayed laying off anyone or taking any other action until he had an opportunity to determine if additional orders would be obtained elsewhere....

[Before] entering the hospital on the following Monday [after his return from South America], it was necessary for Mr. Bryan to decide between May 7 and May 9 on the size of the layoff *and to determine who would be laid off....*

[After his return from South America,] Mr. Bryan took the only action open to him, deciding between May 7 and May 9 on the number *and identity* of employees to be laid off.

instating Lynn Brown, Frank Ferrell, Fay Gray, and Grace Harry, but deny enforcement as to Richard Schucker.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.