**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
<u>Petitioner,</u>

v.                                                                      No. 98-1403

STARK ELECTRIC, INCORPORATED,
<u>Respondent.</u>

On Application for Enforcement of an Order
of the National Labor Relations Board.
(9-CA-33933)

Argued: October 26, 1998

Decided: November 30, 1998

Before ERVIN and HAMILTON, Circuit Judges, and
ANDERSON, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Enforcement granted in part and denied in part by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Preston Langdon Pugh, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for Petitioner. James William
St Clair, ST CLAIR & LEVINE, Huntington, West Virginia, for
Respondent. **ON BRIEF:** Frederick L. Feinstein, Acting General
Counsel, Linda Sher, Associate General Counsel, Aileen A. Arm-
strong, Deputy Associate General Counsel, Peter Winkler, Supervi-

sory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The National Labor Relations Board (the Board) petitions for enforcement of its order finding that Stark Electric, Inc. (Stark Electric) committed violations of §§ 8(a)(1) and (a)(3) of the National Labor Relations Act (NLRA). See 29 U.S.C.§§ 158(a)(1) and (a)(3). For the reasons stated below, we grant the Board's petition in part and deny it in part.

I

Stark Electric is an electrical contractor that performs work primarily at commercial sites in and near Huntington, West Virginia. Stark Electric's principal shareholder and field supervisor is Bill Stark, who is in his early eighties. Stark Electric's president and office manager is Karen Stark, Bill Stark's daughter.

At the beginning of 1996, Stark Electric had only two electricians, Mike Hickman and Anthony Napier. By the end of January 1996, Stark Electric had five electricians, Hickman, Napier, Terry Quintrell, Jim Downs, and Mark Childers. Except for Napier, these five worked continuously for Stark Electric at least through the end of July 1996. Napier last worked for Stark Electric on April 5, 1996.

In mid-March 1996, Stark Electric began installing wiring and electrical fixtures at a Lone Star Steakhouse in the Huntington area. In mid-April 1996, Stark Electric began doing similar work at an Applebee's Restaurant located in the Huntington area. These projects

2

caused Stark Electric to hire additional electricians. On April 1, 1996, Stark hired Michael Mayo, who had worked for Stark Electric on and off since 1992. Between April 9 and May 3, 1996, Stark Electric hired Michael Price, Tim Stidham, Joseph Gregory, Joel Stidham, Joseph Rose, and Dwayne Pennington.

For reasons not disclosed in the record, Joel Stidham and Joseph Gregory left Stark Electric shortly after they were hired. In response, Stark Electric hired Eric Wilburn on May 7.

After work on May 14, 1996, Price and Pennington met with Sherman Nicholas, the organizing coordinator for the International Brotherhood of Electrical Workers, Local 317, AFL-CIO (the Union), in a parking lot adjacent to the Applebee's Restaurant project. Price and Pennington signed cards authorizing the Union to represent them.

Soon after leaving Price and Pennington, Nicholas wrote the following letter to Bill Stark:

> The purpose of this letter is to make you aware that this office is assisting a group of your employees who wish to organize and join the International Brotherhood of Electrical Workers.
>
> At no time will we attempt to disrupt your work nor will we engage in any activities not protected under the National Labor Relations Act.
>
> Also, I would like to invite you to meet us to discuss the benefits of being a Union contractor. If you would like to talk to us concerning either of these matters, you can contact myself or [our] Business Manager, William Taylor, at the above address and phone number.

Nicholas' letter was received by Karen Stark on May 16, 1996. On that day, Eric Wilburn signed an authorization card at the Union hall. He also encouraged other employees to join the Union. Sometime in May 1996, Michael Mayo signed an authorization card. Neither Price, Pennington, Wilburn, nor Mayo informed Stark Electric that they had

3

signed authorization cards. Also, there is no evidence in the record that Stark Electric knew which employees had signed authorization cards or were otherwise sympathetic to the Union.

On May 17, 1996, Joseph Rose worked his last day for Stark Electric. On May 24, 1996, Tim Stidham worked his last day for Stark Electric. On that same day, Bill Stark approached Eric Wilburn and told him that he was discharged.

In late May and early June 1996, two electricians had a short stint with Stark Electric. John Sharkey worked 27-1/2 hours during the week of May 19-25, 1996. Jim Shope worked twenty-four hours from May 23-25, 1996, and eight hours on June 1, 1996.

Price and Pennington's last day at Stark Electric was May 27, 1996. Bill Stark told Pennington, who was on the Applebee's Restaurant project that day, that he was not happy with his work. Karen Stark told Price that Stark Electric had no more work for him.

The record reflects that the number of hours worked by electricians at Stark Electric decreased markedly after May 25, 1996. The following is a summary of the hours for which Stark Electric's electricians were paid for the weeks ending May 4 through June 9:

Week ending May 4    Regular hours:   353.5
                     Overtime hours:   51.0

Week ending May 11   Regular hours:   406.5
                     Overtime hours:    0

Week ending May 18   Regular hours:   402.5
                     Overtime hours:   40.5

Week ending May 25   Regular hours:   431.0
                     Overtime hours:   31.0

Week ending June 1   Regular hours:   263.5
                     Overtime hours:   23.0

4

Week ending June 9  Regular hours:   230.0
Overtime hours:    1.5

The hours worked at the Lone Star Steakhouse and Applebee's Restaurant projects also declined in late May and early June. For the weeks ending May 25, June 1, June 9, and June 15, 1996, the electricians worked 390, 191, 86-1/2, and ninety-eight hours, respectively. For the week ending June 15, the electricians only worked two hours at the Lone Star Steakhouse project.

Two days after Price and Pennington were discharged, a new employee, Kevin Scaggs, started working for Stark Electric. After discharging Price and Pennington and hiring Scaggs, Stark Electric had six full-time electricians working for it. These were the four employees who had been with Stark Electric since January, (Hickman, Quintrell, Downs, and Childers), Mayo, who had worked for Stark Electric in prior years, and Scaggs. On June 10, 1996, Terry Hunley began working for Stark Electric. Hunley worked on several projects through July 10, 1996.

Before the ALJ, the Board also introduced evidence concerning Stark Electric's attempts at defeating unionization. For example, during Dwayne Pennington's pre-employment interview, Bill Stark asked him if he was "one of those Union bastards?" On a couple of occasions after Pennington started working, Bill Stark asked him if he had seen Nicholas on the job site. One day, Stark said he had to go to another site because "that SOB Union organizer" was there. When Stark returned, he said he just missed Nicholas, but said he would like to get his hands on him.

Eric Wilburn also heard Bill Stark make derogatory comments about the Union. Bill Stark said members of the Union were lazy, that the Union protected the lazy, and that he would not have any members of the Union working for him.

Michael Price heard Bill Stark say on one occasion that the "Union SOBs" had called the fire marshal and, as a result, Bill Stark had to send all the employees at the Lone Star Steakhouse project home. On another occasion, Price heard Bill Stark say that if he caught the

5

"Union SOBs" at the Lone Star Steakhouse project, he would run them off.

On June 3, 1996, the Union initiated this case by filing unfair labor practice charges with the Board. The Board's General Counsel issued a complaint on October 2, 1996. The ALJ held a hearing on February 5, 1997, and issued a decision on April 27, 1997. The ALJ found that Stark Electric committed several violations of the NLRA. Specifically, the ALJ found that: (1) Stark Electric violated § 8(a)(1) of the NLRA by making comments designed to defeat unionization; and (2) Stark Electric violated § 8(a)(3) of the NLRA when it discharged Wilburn, Pennington, and Price because of their union activity. The ALJ's order requires Stark Electric to cease and desist from the unfair labor practices found and from otherwise interfering with, restraining, or coercing employees in the exercise of their rights guaranteed by the NLRA. The ALJ's order directs Stark Electric to offer reinstatement and back pay to Wilburn, Price, and Pennington. The ALJ's order also requires Stark Electric to expunge any record of its discriminatory intent from its files, to notify the employees that this has been done, and to post a remedial notice.

On November 7, 1997, the Board affirmed in all material respects the ALJ's findings, conclusions, and remedial order. The Board now petitions this court for enforcement of its order.

II

The Board possessed subject matter jurisdiction below pursuant to 29 U.S.C. § 160(a). The Board's decision and order of November 7, 1997, constitutes a final order under the NLRA, and thus we possess appellate jurisdiction pursuant to 29 U.S.C. §§ 160(e) and (f).

The Board's decision is to be upheld if its factual findings are supported by substantial evidence on the record. See 29 U.S.C. § 160(e). This is so "even though we might have reached a different result had we heard the evidence in the first instance." NLRB v. General Wood Preserving Co., 905 F.2d 803, 810 (4th Cir. 1990). "Substantial evidence has been held to mean `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting

6

NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp. , 855 F.2d 1174, 1178 (6th Cir. 1988)).

III

Stark Electric contends that substantial evidence does not support the Board's decision holding that it violated § 8(a)(1) of the NLRA when Bill Stark made comments designed to defeat unionization. We disagree.

Under § 8(a)(1) of the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the NLRA. 29 U.S.C. § 158(a)(1). Section 7 guarantees employees, among other things, the right to "self-organization, to form, join or assist labor organizations." Id. If a right guaranteed by § 7 is implicated, a § 8(a)(1) violation is established if, "under all the circumstances, the employer's conduct may reasonably tend to coerce or intimidate employees." NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997). The employer's language or acts need not be "`coercive in actual fact.'" Equitable Gas Co. v. NLRB, 966 F.2d 861, 866 (4th Cir. 1992). Rather, we must determine "whether the conduct in question had a reasonable tendency in the totality of circumstances to intimidate." Id. The question of "[w]hether particular conduct is coercive is a `question essentially for the specialized experience of the NLRB,'" Grand Canyon, 116 F.3d at 1044.

Our § 8(a)(1) inquiry does not end here. We must also balance "the employee's protected right against any substantial and legitimate business justification that the employer may give for the infringement." Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 745 (4th Cir. 1998). "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 269 (1965); see also Eastex, Inc. v. NLRB, 437 U.S. 556, 570-74 (1978) (balancing interests). This determination is also squarely within the specialized expertise of the Board. See Medeco Sec. Locks, Inc., 142 F.3d at 745. "[I]t is the primary responsibility of the Board and not the courts to strike the proper balance between the asserted business justifications and the invasion of employee

7

rights in light of the Act and its policy." Jeannette Corp. v. NLRB, 532 F.2d 916, 918 (3d Cir. 1976) (citation and internal quotation marks omitted). We must affirm the Board's balancing if it is rational and consistent with the NLRA. See Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501 (1978); Medeco Sec. Locks, Inc. , 142 F.3d at 745. Accordingly, "an independent violation of § 8(a)(1) exists when (1) an employer's action can be reasonably viewed as tending to interfere with, coerce, or deter (2) the exercise of protected activity, and (3) the employer fails to justify the action with a substantial and legitimate business reason that outweighs the employee's § 7 rights." Medeco Sec. Locks, Inc., 142 F.3d at 745.

In their totality, the statements made by Bill Stark set forth in Part I of this opinion, supra 5-6, had a reasonable tendency to intimidate employees from attempting to organize. Accordingly, the first two prongs of a § 8(a)(1) violation are met. Cf. Equitable Gas Co. v. NLRB, 966 F.2d 861, 867 (4th Cir. 1992) (employer's references to union "hassles," his allusion to arming the bunnies and "letting them shoot," and his claim that Equitable would increase automation and the use of outside contractors if the union did not cooperate were implied threats of reprisal for union activities); NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 966 (4th Cir. 1985) (substantial evidence supported finding by the Board that employer's foreman coercively interrogated employee regarding employee's union sympathies where employer's opposition to union was clear, foreman had authority to hire and fire as he saw fit and there was no evidence that the foreman explained purpose of such questioning or gave employee any assurances against retaliation); NLRB v. McCormick Concrete Co., 371 F.2d 149, 152 (4th Cir. 1967) (holding that statement that "a union would do employees no good" can be unlawfully coercive). Because Stark Electric offered no business justification for the statements at issue, the third prong of a § 8(a)(1) violation is met. Accordingly, we will enforce the decision of the Board finding that Stark Electric violated § 8(a)(1) of the NLRA when Bill Stark made comments designed to defeat unionization.

IV

We next turn to consider whether we should enforce that portion of the Board's order finding Stark Electric guilty of violating

8

§ 8(a)(3) of the NLRA. See 29 U.S.C.§ 158(a)(3). Discriminatory discharge is an unfair labor practice under § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3).* However, an employer's actions violate this section only if they are motivated by anti-union animus. See Goldtex, Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994). In FPC Holdings, Inc. v. NLRB, 64 F.3d 935 (4th Cir. 1995), we set forth the standard to be applied in § 8(a)(3) cases:

> The Board has established a formula for determining when an allegedly discriminatory discharge violates the[Act]. First, the General Counsel must make out a prima facie case that the employer's decision to lay off an employee was motivated by anti-union animus. The burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity. To make out a prima facie case, the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action. Motive may be demonstrated by circumstantial as well as direct evidence and is a factual issue which the expertise of the Board is peculiarly suited to determine.

Id. at 942 (citations and internal quotation marks omitted).

The issue in this case, then, is whether substantial evidence on the whole record can sustain the Board's finding that the discharges of Price, Pennington, and Wilburn were partly or wholly motivated by the purpose of discouraging union activities at Stark Electric. See NLRB v. Instrument Corp. of America, 714 F.2d 324, 328 (4th Cir. 1983). Although the Board's determination of motive will not be overturned if it is reasonable, "mere speculation as to the [employer's] real motives registers no weight on the substantial evidence scale." Id.

_____

*Section 8(a)(3) of the NLRA provides in pertinent part: "It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).

9

(citations and internal quotation marks omitted). Of course, Stark Electric can attempt to rebut the prima facie case once established by presenting a valid business justification. See Goldtex, Inc., 14 F.3d at 1013.

In this case, the Board failed to establish what we have described as § 8(a)(3)'s "most basic element," namely, that the employer was aware of the employees' protected activities. Id. at 1011. While it is true that Stark Electric was aware that the Union was "assisting a group of employees" in organizing, there is no evidence that Stark Electric had knowledge of which employees formed that "group," and hence Stark Electric could not have known that Pennington, Price, and Wilburn were engaged in protected activities.

We recognize that a company can violate § 8(a)(3) by discharging employees who are not union sympathizers in an effort to send an anti-union message or to otherwise discourage union membership. See Medeco Sec. Locks, Inc., 142 F.3d at 744. However, the Board must present some evidence that the discharges were motivated by anti-union animus. Id. In this case, the Board did present evidence that Bill Stark did not like unions and did not want union members working for him. However, General Counsel never proved that the discharges at issue were designed to discourage union activities. Rather, the record reflects that the discharges of Price, Pennington, and Wilburn were necessitated by available work, i.e., economic circumstances. Between May 25 and June 1, 1996, work performed by Stark Electric's electricians declined from 462 to 286 hours. The two major projects, the Lone Star Steakhouse project and the Applebee's Restaurant project, were nearing completion. On these projects, between May 25 and June 1, 1996, the hours worked by the electricians decreased from 390 hours to 191 hours. Faced with the nearing completion of two major projects, discharges were inevitable.

Because the discharges were necessitated by economic circumstances, the fact that the discharges of Price, Pennington, and Wilburn occurred at a time when: (1) the electricians were attempting to organize; and (2) Bill Stark made certain comments designed to defeat unionization, does not automatically infect all the discharges. Further, the hiring of Scaggs shortly after the discharges does not help the Board's cause. Before we can enforce the Board's order, substantial

10

evidence must exist that the discharges were for the purpose of discouraging union activity. Goldtex, Inc., 14 F.3d at 1012. Such evidence is absent in this case, and therefore, we must deny enforcement of this portion of the Board's order. To hold otherwise, companies such as Stark Electric "would lose the flexibility to control the size of their work force when adverse economic conditions required a reduction in personnel." Id.

Because there is no evidence in the record suggesting that Stark Electric knew of Price, Pennington, and Wilburn's union activities or that the discharges were designed to send an anti-union message, the Board's decision that Price, Pennington, and Wilburn were discharged because of their union activity in violation of§ 8(a)(3) of the NLRA is not supported by substantial evidence.

V

For the reasons stated herein, the Board's petition for enforcement is granted in part and denied in part.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART

11