JEFFREY MANUFACTURING DIVI-
SION, DRESSER INDUSTRIES,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 80–1163, 80–1707.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1981.

Decided July 16, 1981.

946

Stuart M. Vaughan, Jr., Greenville, S. C. (John S. Burgin, Ogletree, Deakins, Nash, Smoak, Stewart & Edwards, Greenville, S. C., on brief), for petitioner.

Barbara G. Gehring, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and PHILLIPS and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Jeffrey Manufacturing Division, Dresser Industries, Inc. (the company) petitions this court for review of two orders issued by the National Labor Relations Board (the Board) on March 3, 1980, and September 30, 1980, and the Board cross-applies for enforcement of the orders. We hold that there is substantial evidence to support the Board's unfair labor practice findings and its findings with respect to certain challenged ballots. Accordingly, we grant enforcement of all the Board's chosen remedies, except for the bargaining order issued pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which we find to be inappropriate under the circumstances of this case.

## I. BACKGROUND

This dispute arises out of the employees' attempts to unionize the company's plant in Belton, South Carolina. Employee Terry Boyter, after making the initial contacts with the headquarters of the United Steelworkers of America (Steelworkers) in February 1977, succeeded in getting a Steelworkers' representative to meet with the company's production and maintenance employees in May 1977. Only Boyter, one fellow worker, and the union representative attended the initial meeting on May 10, 1977, but the following evening, another meeting was held, and approximately six employees were present, all of whom signed union authorization cards and obtained additional cards for distribution. In May 1977, Boyter and several other employees openly distributed union cards and solicited signatures on a regular basis after working hours in the company parking lot. At the end of May, however, Boyter was discharged, leaving other employees to continue the union effort.

Shortly after the employees had begun their organizational drive, the company management commenced a counter-campaign, during which it convened groups of employees to tell them that they did not need a union and confronted individual employees about their union activities. The Board, adopting the findings of the Administrative Law Judge (ALJ), recognized approximately thirteen instances, occurring between mid-May and late October 1977, in which company supervisors and officials interrogated individual employees about their union activities or sentiments.

On September 15, 1977, after obtaining approximately eighty signed authorization cards out of a unit composed of 133 employees, the union demanded in writing that the company bargain with it as the exclusive representative of its production and maintenance employees; the company refused. The next day, the union filed a petition for an election with the Board's Regional Director. At the election on October 27, 1977, sixty-five votes were cast for the union and

sixty-three votes against it. There were four unopened challenged ballots.[1]

The union filed unfair labor practice charges with the Board's Regional Director. The Regional Director charged the company with numerous violations of section 8(a)(1) of the National Labor Relations Act (the Act),[2] arising out of allegations that the company unlawfully interrogated employees, created an impression of surveillance over employees' protected concerted activities, made economic threats, and solicited employee grievances to undermine employees' union support. The company was also charged with violating section 8(a)(3) and (1), by discharging Boyter allegedly because of his involvement in union activities and by refusing to reinstate him. A section 8(a)(5) and (1) charge was issued based on the company's refusal to bargain collectively with the union as the employees' exclusive bargaining representative.

The unfair labor practice charges were heard simultaneously with both parties' challenges to the ballots. The Board, adopting the ALJ's findings, found approximately sixteen section 8(a)(1) violations. It also agreed with the ALJ that the company violated section 8(a)(3) and (1) when it discharged Terry Boyter and that two of the challenged ballots, including Boyter's, should be opened and counted. Thus, the Board ordered the Regional Director to issue a revised tally and to certify the union if it received a majority of the votes. Contrary to the ALJ, however, the Board concluded that the union had obtained a majority of valid authorization cards by September 16, 1977, and had maintained its majority status through October 25, 1977. In light of this conclusion, the Board issued a *Gissel* bargaining order.

Because the revised tally showed that the union had prevailed by one vote, the union was certified as the exclusive bargaining representative of the company's production and maintenance employees. The company, however, refused to bargain, contending that its petition for review by this court of the Board's order suspended its duty to bargain. Unfair labor practice charges were filed against the company because of its refusal to bargain. The Board in its decision of September 30, 1980, found that the company's duty to bargain was not suspended pending the completion of collateral litigation and that its conduct thus violated section 8(a)(5) and (1) of the Act. The Board ordered the company to bargain with the union upon request and to take other remedial action. The company petitioned this court for review of this order, and the two petitions have been consolidated for review.

## II. SECTION 8(a)(1) VIOLATIONS

The Board found that numerous section 8(a)(1) violations were committed by the company during the employees' organizational drive. We must uphold the Board's findings if they are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951).

██ Although the testimony conflicts, the ALJ explained his credibility determinations, and the Board adopted his findings. After a careful review of the testimony at the hearings, we conclude that there is substantial evidence supporting the ALJ's credibility determinations, *see NLRB v. Holly Farms Poultry Industries, Inc.*, 470 F.2d 983, 985 (4th Cir. 1972), and his findings with respect to each incident giving rise to a section 8(a)(1) violation.[3]

1. The number of challenged ballots was subsequently reduced to three when the union withdrew one of its challenges.

2. The Act is codified in 29 U.S.C. § 151, *et seq.*

3. The company also contends that, even if there is substantial evidence supporting the Board's findings of employer interrogation, the interrogations were not sufficiently coercive to constitute violations of the Act. The company

argues that the ALJ and the Board were required to judge the alleged interrogations according to the criteria set forth in *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964).

The Fourth Circuit has never deemed itself bound by the *Bourne* criteria. *See NLRB v. Lexington Chair Co.*, 361 F.2d 283, 289 n.6 (4th Cir. 1966) (court used the *Bourne* test but noted that the *Bourne* factors are not the exclusive

### III. SECTION 8(a)(3) and (1) VIOLATION

The company contends that it did not act unlawfully in discharging union activist Boyter shortly after the union campaign commenced. We disagree.

 Whether a discharge was the result of an employee's union activities is a question of fact, and the Board's determination will not be overturned if there is substantial evidence to support it. *NLRB v. Lester Brothers, Inc.*, 337 F.2d 706, 708 (4th Cir. 1964). In making its determination, the Board may consider both direct and circumstantial evidence. The Board's choice between two fairly conflicting views should be upheld by the court, even though the court might have chosen the other view if trying the case de novo. *NLRB v. Overnite Transportation Co.*, 308 F.2d 284, 288 (4th Cir. 1962). The mere fact, however, that a union activist was discharged during a union campaign does not support a charge of discriminatory motivation if there is supportable cause for the discharge. *NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 994 n.5 (4th Cir. 1979). When a company shows a valid reason for discharging or disciplining an employee, the Board must show an affirmative and persuasive reason why the employer did not rely on this valid reason but instead chose an improper one. *NLRB v. Burns Motor Freight, Inc.*, 635 F.2d 312, 314 (4th Cir. 1980).

Boyter was hired by the company at its Belton plant in 1971. Eller, the plant supervisor, testified that Boyter was a good machinist during the whole period of his employment with the company, and both Eller and Boyter's immediate supervisor Kay McCurry testified that Boyter often had an efficiency level above one hundred per cent. There is no evidence that Boyter had ever been warned about poor production, and the evidence shows that he progressed in his job duties.

During Boyter's last two years with Jeffrey, however, four written reports of "unusual conduct" were placed in his personnel file. The reports stated that he had left his machine during working hours. There is no evidence that Boyter received a copy of the reports, and there is conflicting evidence on whether he was even informed on certain of those occasions that he was being reported.

The fourth incident occurred on May 25, 1977, when Boyter left his machine to use the bathroom and to get a drink of water and about ten minutes later was observed talking to a fellow employee. Foreman Jim Matheson, who was temporarily overseeing the department in which Boyter worked, questioned Boyter about being away from his machine and told him to return to it. Boyter, who was not aware that Matheson was acting as his supervisor, directed some profane words toward him. Matheson informed Boyter that he was going to report him and did so. Boyter then returned to his machine. When apprised of the incident, factory superintendent Ted Eller told Matheson to take the report to personnel manager Frank Ford. Ford testified that he and Eller, in turn, met with plant manager Robert Zwick, who read the report and other materials in Boyter's personnel file and then told them to fire Boyter. Shortly thereafter, Ford and Eller called Boyter and Matheson to Ford's office and asked Boyter for his version of the incident. After hearing Boyter's version, Ford told him that, in view of the other warnings, the company had no choice except to fire him.

 The Board found that the company's reliance on the three prior similar warnings as forming a business justification for dis-

criteria by which to judge company interrogation and that a single question put to a single employee may constitute an unfair labor practice if there is a background of union hostility). Whether company inquiry into union affiliation is unlawful depends on the surrounding circumstances of each case. *See Filler Products, Inc. v. NLRB*, 376 F.2d 369, 374 (4th Cir. 1967). Furthermore, it is within the Board's sound discretion to ascertain whether a company's interrogation should be viewed as coercive. *Id.* In light of the surrounding circumstances in our case, including evidence showing the company's hostility toward the advent of the union, we conclude that the Board did not abuse its discretion in finding the company's interrogation to be unlawful.

missing Boyter was merely a pretext and that the company's real reason for the dismissal was Boyter's union activity. For the following reasons, we find that there is substantial evidence to support the Board's conclusion.

First, the decision making process used in Boyter's dismissal was contrary to the company's normal policy of leaving disciplinary matters to an employee's foreman. It appears quite unusual for management as high ranking as Zwick to become involved in disciplining employees. In fact, Eller testified that even he typically did not get involved; yet, in Boyter's case, Eller was the lowest ranking person on the decision making team. Furthermore, whereas the employee's foreman typically metes out discipline or at least is consulted prior to its imposition,[4] both Ford and Matheson testified that Matheson was not involved in the decision making process, and there is no evidence that Boyter's supervisor was ever consulted prior to the dismissal.

Second, the company's insistence that Boyter had to be discharged because of his three prior warnings is not supported by the company's written disciplinary policy that "[d]ischarge will be considered where an employee accumulates three 'Reports of Unusual Conduct' for the same offense." (emphasis added). The policy certainly does not mandate dismissal. Although the third written report indicated that Boyter had been given his last chance, there is conflicting evidence whether he had been so warned, and it is clear that Boyter did not receive a copy of the report.

Additionally, somewhat differing explanations were given for Boyter's discharge. Eller testified that the decision to dismiss Boyter was based in part on the profane remarks made to Matheson. Ford, however, testified that the only reason for discharging Boyter was that the company had no alternative in light of the three prior warnings.

Boyter was the key figure in the employees' organizing drive. His dismissal came shortly after he had actively and openly engaged in soliciting and collecting authorization cards for the union. The evidence shows that company officials knew of Boyter's union activities at least by early to mid-May, if not sooner.[5] Furthermore, the company's actions indicate that it was not pleased with the advent of the union activity.

In light of Boyter's history of high production, the summary procedure used to dismiss him without the expressed consent of his immediate supervisor, the lack of conclusive evidence that Boyter knew he had been reported three times in the past and that he had been given a final warning, and the somewhat differing explanations given for his discharge, the Board's finding that the company's rationale for discharging him was merely a pretext is supported by substantial evidence. Furthermore, the Board has affirmatively and persuasively shown by evidence of the company's anti-union animus, Boyter's involvement in organizing the union, and the company's knowledge thereof, that the real reason for

4. The company's written disciplinary policy in effect at the time of Boyter's discharge emphasized the foreman's role in disciplining his employees and provided:

Each foreman acts on his own with the stipulation that what applies to one employee for a specific incident must be applied to every employee working for that foreman thereafter.... [I]t is insisted that disciplinary action within a department will be uniformly applied.

The evidence further indicates that the foreman is the primary disciplinarian with respect to the employees in his department. For example, when Boyter left his machine early for lunch in late April or early May, McCurry con-

templated suspending Boyter for three days. Although McCurry consulted Eller, Eller merely read McCurry the company's disciplinary policy and left the suspension decision totally to McCurry. There is no evidence in the record that Boyter was suspended.

5. Eller, for example, was observed watching Boyter distribute and collect authorization cards, and he questioned Boyter about his union activities on several occasions within the two or three week period prior to his dismissal. Eller also informed other company officials and supervisory personnel, including personnel manager Ford, that Boyter was involved in soliciting cards.

Boyter's discharge was his union activities. Accordingly, the company violated section 8(a)(3) and (1) of the Act in dismissing Boyter and in refusing to reinstate him. Because Boyter's discharge was unlawful, the Board did not err in directing that Boyter's ballot be counted.

## IV. SUPERVISORY STATUS OF WILLIAM R. FORD

■ Section 2(11) of the Act defines "supervisor" as

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. 29 U.S.C. § 152(11).

A person may be deemed a supervisor if he performs any one of the functions set forth in the statutory definition, regardless of how frequently he exercises that function. *NLRB v. Pilot Freight Carriers, Inc.,* 558 F.2d 205 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978).

■ The Board concluded that William R. Ford was a supervisor and that his vote should not be counted. There is substantial evidence supporting the Board's finding, including evidence that employees were told by foreman Chester Mason to consult Ford for their work-related problems and in fact did so, that Ford had authority to sign procurement slips for other employees, and that, unlike other employees, Ford had the keys to his department's tool cabinet. Ford was not classified as a production worker, as were the other employees in his department, and indeed he was compensated at a rate at least two levels higher than any other employee in his department. Ford trained employees, checked other employees' work product, and assigned work to other employees. There is also evidence that employees in Ford's department consulted him for time off, and that Ford had let several employees leave work early.

The company contends that Ford's apparent authority was merely of a routine nature. After weighing the evidence, we are satisfied that the Board's finding on this issue is supported by substantial evidence. Accordingly, the Board did not err in concluding that Ford's vote should not be counted.

## V. THE BARGAINING ORDER

■ The Board, relying on *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), issued an order requiring that the election be set aside if a tally of the ballots showed that the union had lost the election and requiring that the company bargain with the union. Under *Gissel,* a bargaining order without an election is proper if the company is found to have committed outrageous and pervasive unfair labor practices. If, however, the unfair labor practices are found not to have been egregious, a bargaining order is proper only if it is shown that the union once had a majority support, that such support had been dissipated by the employer's pervasive misconduct, and that the possibility of erasing the effects of the unfair labor practices and ensuring a fair election is slight. *NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988 (4th Cir. 1979). The Board found that this case fell within the latter category.

The Board found that the union had obtained a card majority on September 16, 1977. The company's primary objection to the cards is to ten of those solicited by employee Terry Boyter; it contends that the ten employees did not realize that they were signing dual purpose cards.[6] We find

---

**6.** The cards provided:

I hereby request and accept membership in the United Steelworkers of America, and of my own free will hereby authorize the United Steelworkers of America, its agents or representatives, to act for me as a collective bar-

this contention to be without merit because the language of the card is unambiguous on its face. Under *Gissel*, if a card unambiguously authorizes the union to represent the signing employee for collective bargaining purposes, then a signed card will be counted unless there is proof that the signing employee was told by the distributor that the card was to be used *solely* for the purpose of obtaining an election.

Eight of the ten employees testified at the hearing. All eight said that they had read their cards prior to signing them; no one testified that Boyter told him that the sole purpose of signing the card was to secure an election. Thus, the cards were not invalid, and there is substantial evidence to support the Board's conclusion that the union enjoyed majority support on September 16, 1977.

In light of our conclusion that Boyter's vote should be counted and that Ford's should not, the evidence indicates that the union prevailed in the October 1977 election by one vote. Thus, the union never lost its majority status. Accordingly, a *Gissel* bargaining order is unnecessary under the circumstances of this case.

## VI. CONCLUSION

The Board's order, except for the *Gissel* bargaining order, should be enforced.

*ENFORCEMENT GRANTED IN PART AND DENIED IN PART.*

gaining agency in all matters pertaining to rates of pay, wages, hours of employment, or other conditions of employment, and to enter into contracts with my employer covering all such matters.