The BABCOCK & WILCOX
COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmith, Forgers and Helpers, AFC–CIO, /R, Intervenors.

No. 81–1787.

United States Court of Appeals,
Fourth Circuit.

Argued March 1, 1982.

Decided July 22, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 1, 1982.

William A. Ziegler, New York City, for petitioner.

Linda B. Weisel, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Bernard P. Jeweler, Washington, D. C., on brief), for respondent.

Before WINTER, Chief Judge, and ERVIN and CHAPMAN, Circuit Judges.

ERVIN, Circuit Judge:

This is a petition for review of an order of the National Labor Relations Board (Board) and a cross-application for enforcement of the Board's order. The Board found that the petitioner, Babcock & Wilcox Company (Company), had violated § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1973), by discharging employee Robert Hall and had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1973), by instructing a temporary foreman to observe Hall's working habits. We hold that there is substantial

evidence to support the Board's finding of a discriminatory discharge under § 8(a)(3). That part of the order is affirmed and enforcement hereby is granted. We find that there is not sufficient evidence of a § 8(a)(1) violation, however, and accordingly vacate that part of the order and deny enforcement.

## I.

Robert Hall was discharged by the Company on March 24, 1980. At that time, he had been employed as an inspector in the quality control department for ten years. On three previous occasions Hall had been active in union organizing campaigns. During the unionization drives he wore pro-union buttons, was a campaign organizer, and recently was an election observer for the union. At the time of Hall's discharge, rumors of another union campaign were known to supervisors and workers throughout the department. When Hall was asked about the rumors by his foreman, he responded that he hoped they were true. Hall's pro-union sentiments were well known among his superiors. On one occasion, shift foreman Paul Goff instructed acting foreman Franklin Metz to observe Hall closely because he drifted around the plant frequently, was a troublemaker, and was involved with the union. (See section II, infra).

On March 17, 1980, Hall observed some irregularities in a component he was inspecting. There were no existing company standards for the particular irregularities, so he solicited the opinions of co-workers. When no consensus could be reached among the inspectors, acting foreman Marshall Cunningham was summoned and asked about the acceptability of the component. Cunningham responded that the defects did not violate a "damn thing." Hall became angry, criticized what he considered to be "getting the runaround," and threw a radius gauge.[1] The Company contends that the gauge was thrown at Cunningham, missing him by a dangerously narrow margin, and justifying the dismissal of Hall for committing a violent act. The Administrative Law Judge (ALJ) found, to the contrary, that Hall merely threw the gauge at a wall and that the Company used this event as an excuse to discharge Hall.[2] We are bound to accept the findings of the ALJ, unless they are not supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 476, 95 L.Ed. 456 (1950).

The only witnesses who actually observed the throwing of the gauge were Hall and Cunningham. Others in the area of the component testified only as to the demeanor of the two main characters or as to the locations of people in the inspection area. Cunningham testified that the thrown gauge came within two inches of his head, while Hall stated that the instrument was thrown directly at the wall. Immediately after the throwing incident Hall invited Cunningham to go with him to see Ron Jessee, the department supervisor. Foreman Cunningham refused to go to a higher authority, so Hall returned to his workbench. Cunningham subsequently mentioned the incident to shift foreman Goff, and Goff instructed him to write up the incident. Goff then escorted Cunningham through the personnel channels with the incident becoming more serious with each recitation, until Hall was discharged for "insubordination."

At the administrative law hearing, General Counsel produced evidence of similar occurrences at the plant in which vociferous arguments were had or things were thrown at others. Two such incidents, in fact, involved the throwing of a data pack and a five pound plastic block at foreman Cunningham. In none of these instances were argumentativeness or the throwing of materials found to be insubordinate or justification for discharge. Disparity of treat-

---

1. A radius gauge is an "L"-shaped gauge, with each arm being about the width of a dime and 1½ inches long.

2. The ALJ found that this was not a dual motive case, but that the only motive of the Company was the discriminatory discharge of Hall.

ment may be evidence that a company intentionally discriminated against an employee because of his union views. *American Thread Co. v. NLRB*, 631 F.2d 316 (4th Cir. 1980). The only evidence of consistent treatment offered by the Company involved fisticuffs between a supervisor and employee. Both pugilists were discharged by the Company. The ALJ found that this incident was not analogous to the one currently under consideration, because there the supervisor did bodily harm to the employee and the supervisor was hired within two weeks after his discharge at another plant owned by the Company in the same town.

■ We hold that there is substantial evidence to support the Board's finding that the gauge throwing incident was not the reason for the Company's actions and that the discharge of employee Hall was discriminatory. The remedy of reinstatement with back pay is appropriate in this instance.

## II.

The Board also upheld the finding of the ALJ that the Company had committed a coercive unfair labor practice. The conclusion of the Board was that "(b)y requesting an employee to engage in surveillance of the union activity of other employees, Respondent violated Section 8(a)(1) of the Act."

The questionable conduct occurred when Franklin Metz was acting foreman or shift leader in charge of Robert Hall's crew. Paul Goff, shift foreman, and the immediate superior to Metz, instructed Metz that in the context of carrying out his duties as acting foreman he should observe Hall closely. In particular, Metz testified that:

> We were standing in the main aisle and Mr. Goff pointed to Mr. Hall and told me to keep a close eye on him, that he drifted around the plant quite a bit and he was known to be a troublemaker and he was heavily involved with union activity.

When General Counsel asked if Goff made any other comments, Metz responded that "(h)e said that if he had the opportunity that he would like to get rid of (Hall), that the company would be better off without him." *Id.*

■ The statements attributed to Goff by Metz are certainly strong evidence of anti-union bias and probative as to the discriminatory discharge of Hall. (See section I, *supra.*) The issue for the purpose of a § 8(a)(1) violation, however, is whether the employer has coerced, restrained, or interfered with the rights of the employees. This question is further complicated by the fact that the ALJ first stipulated that Metz was not a supervisor but later stipulated that Metz was a supervisor at the time Goff instructed him to watch out for Hall. We find that there is not substantial evidence to support the Board's conclusion that the remarks by Goff to Metz were coercive toward Metz as an employee.

The already difficult task of distinguishing a supervisor from an employee for the purposes of the Act is made more arduous when the ALJ stipulates that one person is both. The distinction is blurred even more when comments made to a person regarding his duties as a supervisor are construed to be "felt" by him as an employee and, therefore, coercive. The Board's holding that instructions to a person in a supervisory capacity affect that person as an employee is contrary to congressional intent that management should instruct supervisors to carry out company policy in the employer's best interest.

The Act defines "supervisor" in § 2(11),[3] 29 U.S.C. § 152(11)(1973). We consistently have held that § 2(11) is to be read in the disjunctive, and if a person performs *any* function listed by the statute, that person is a supervisor. *See, e.g., Jeffrey Mfg. Div.,*

---

3. Section 2(11) states that "supervisor" means: any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Dresser Ind., Inc. v. NLRB*, 654 F.2d 944, 950 (4th Cir. 1981). How frequently the person exercises the listed function is irrelevant. *Id.* We do not suggest, however, that once one is a supervisor he may never become an employee. The demotion or promotion of a worker may change his status for some purposes of the Act. We recognize that in some situations, a decision must be made as to whether a worker who frequently shifts from supervisory jobs to typical employee functions is ultimately a "supervisor" or an "employee." [4]

The circumstances of this case, however, do not require that Metz be considered solely a supervisor or an employee. The ALJ implicitly recognized this fact when he allowed the stipulation that Metz was normally an employee but later stipulated that Metz was a supervisor at the time of the allegedly coercive statement. The double stipulation and the bold assumption that Metz "felt" the coercive effect as an employee instead of in the context in which the statement was made, make for scant evidence of an unfair labor practice.

The context of the conversation between Goff and Metz raises an additional policy argument against the enforcement of this part of the Board's order. This circuit has long recognized that in passing § 2(11), "Congress was concerned about the effect of unrestricted unionization of first-line supervisors. Congress believed that fraternal union feelings would tend to impair a supervisor's ability to apply his employer's policy to subordinates according to the employer's best interests. (Citations omitted)" *NLRB v. Pilot Freight Carriers, Inc.*, 558 F.2d 205, 207 (4th Cir. 1976), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978). To hold that a person who is given reasons and instructions in his capacity as a supervisor is the victim of an unfair labor practice undermines the spirit of the holding in *Pilot Freight Carriers.* Because a supervisor should be free to apply the company's policy without a conflicting interest in union objectives, it is inconsistent to say that the instructions to the supervisor with respect to his duties are grounds for a § 8(a)(1) violation.[5] An employer should not be deterred from voicing his concerns to temporary supervisors by the fear of committing an unfair labor practice. For these reasons, we find that there has been no § 8(a)(1) violation.

### III.

As to the § 8(a)(3) violation, the Board is affirmed and the order enforced. As to the § 8(a)(1) finding by the Board, its decision is reversed and enforcement is denied.

**ENFORCEMENT GRANTED IN PART AND DENIED IN PART.**

---

**4.** In *Westinghouse Electric Corp. v. NLRB*, 424 F.2d 1151 (7th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970), the Seventh Circuit permitted the Board to use a 50% formula to determine whether certain workers could vote in a union election. Under that formula, if a worker held a supervisory position for more than 50% of the time he was considered a supervisor and unable to vote. The worker was an employee and allowed to vote if he assumed a supervisory position for less than 50% of the time. Without making any decision as to the acceptability of this formula in the Fourth Circuit when a change of jobs is at question, we note that the Seventh Circuit limited its holding to the question of who may vote in a union election as related to the facts of that case. *Id.* at 1158.

**5.** We note that our holding touches upon the problem of employers who try to make employees appear as supervisors in order to remove them from the protection of the Act. In this case, the allegiance of Metz to his employer was unquestionable; he had been a company observer at the last union election and frequently had been called upon to be a temporary supervisor. There is no evidence that the comments to him were intended to be, or taken as, anything other than advice to him in his capacity as supervisor and reasons for that advice. We certainly do not condone bad faith efforts to make an employee appear to be a supervisor in order that coercive tactics may be used.