McLEAN TRUCKING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–1455.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided Oct. 6, 1983.

Claude M. Hamrick, Winston-Salem, N.C. (Wayne H. Foushee, Richard Tyndall, Richmond W. Rucker, Winston-Salem, N.C., on brief), for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Washington, D.C., on brief), for respondent.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

Cases are sometimes not as simple as they seem. So it is here. The General Counsel for the National Labor Relations Board lodged an unfair labor practice charge against the employer, McLean Trucking Company, alleging that an employee, Carl D. Daniels, was discharged as a consequence of McLean's anti-union bias in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3). The matter is here on McLean's petition for review and the Board's cross-petition for enforcement of a cease-and-desist order issued against McLean.

## I.

■ It is helpful to sketch the background of the legal landscape before painting in the factual details. As is frequently the case where a discriminatory discharge is alleged, the central and difficult issue is one of fact—the motive of the employer. If anti-union animus, a discriminatory motive, was "a factor" in the employer's decision to discharge the employee, the unfair labor practice is established. *NLRB v. Kiawah Island Co.*, 650 F.2d 485, 490 (4th Cir.1981); *American Thread Co. v. NLRB*, 631 F.2d 316, 320 (4th Cir.1980); *Neptune Water Meter Co. v. NLRB*, 551 F.2d 568, 569 (4th Cir.1977); *NLRB v. Consolidated Diesel Electric Co.*, 469 F.2d 1016, 1024 (4th Cir. 1972). Because the issue is one of fact, our scope of review is limited. We must see whether substantial evidence on the record as a whole supports the determination of the Board. *E.g., Jeffrey Manufacturing Division v. NLRB*, 654 F.2d 944, 948 (4th Cir.1981).

As countless judicial opinions reveal, the hard cases are those that feature evidence of both improper and good motivation—the so-called "dual motive" scenario. In such circumstances, the employer typically contends that, even though it was far from pleased by an employee's protected activities, the discharge nevertheless was motivated solely by and predicated exclusively upon legitimate management concerns. Where the case assumes that posture, we require that "the evidence must demonstrate why the good motive was not the sole reason for the discharge." *Kiawah Island, supra,* at 491. The Board must articulate, with support in the record, "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." *Firestone Tire & Rubber Co. v. NLRB*, 539 F.2d 1335, 1337 (4th Cir.1976). If "an affirmative and persuasive reason" is shown, then it fairly can be said that anti-union animus was "a factor" in the discharge. If "an affirmative and persuasive reason" is not articulated and supported, our unbroken practice has been to decline enforcement because, as a

reviewing court, we are unable to determine whether the Board has in fact given due consideration to the record as a whole. In such circumstances, the Board's decision is, in essence, a declaration that "the discharge was 'pretextual.' ... [That is] 'all too easy to say.'" *Firestone Tire, supra*, at 1337.[1]

## II.

■ Making the case seem, at first blush, rather simple is the fact that there is substantial evidence in the record to support the Board's initial conclusion that McLean harbored an anti-union animus with regard to Daniels. Daniels, who was fired on October 9, 1979, actively and zealously engaged in a number of activities protected under the federal labor laws. In particular, Daniels assisted fellow employees in presenting grievances against McLean,[2] filed an even greater number of grievance claims against the company on his own behalf,[3] and, additionally, took an active role in organizational matters.[4] Of course, mere membership in a union, or the mere exercise of rights protected under the National Labor Relations Act, does not immunize an employee from discharge. *E.g., NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988, 994 n. 5 (4th Cir.1979). As the evidence adduced below shows, however, Daniels' protected acts earned him the ire of McLean officials, and those officials in fact expressed their interests in "getting rid" of Daniels because of his persistent protected conduct.[5] Indeed,

1. In the briefs and at oral argument, the NLRB pressed for acceptance of its decision in *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), as a correct statement of the law. In *Wright Line*, the Board, following the course the Supreme Court set forth for unconstitutional dismissal cases in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), stated the following rule for discharge cases raising a problem of "dual motive:"

 First, we shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

 *Wright Line, supra*, at 1089 (footnote omitted).
 Since oral argument, the Supreme Court has agreed with the Board's contention that the *Wright Line* rule shifting the burden to the employer is a permissible construction of the National Labor Relations Act which deserves deference from the courts. *See NLRB v. Transportation Management Corp.*, —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).
 As will become clear later in this opinion, nothing turns on the concept of shifting burdens of proof here. We accept implicitly in our analysis the proposition that McLean bears the burden to establish that it would have discharged Daniels even if he had not engaged in any activities protected by the labor laws.

2. As Daniels testified:
 I would fight these battles ... and I would learn how to deal with the bureaucracy and come back and tell the men how they could protect their rights and how they could do it legally.... [O]n a number of occasions I've written grievances for employees at their request. They would ask me to write a grievance for them and I would.
 Daniels' assistance indeed was welcomed by his fellow employees. As one worker noted, Daniels "was familiar with the contract and how it read. He could interpret it better than I could. And he was also good in the grammar part and he helped me to say things the correct way." In fact, there was testimony that employees would seek out Daniels, rather than their union steward, for help with their grievances, as Daniels was "more knowledgeable ... [about] [t]he contract and Union business. He was more actively involved in the Union."

3. Exhibits introduced at the hearing before the ALJ indicate that Daniels filed at least 64 grievances of his own against McLean over a five-year period, not including his final grievance—the one challenging his discharge.

4. Daniels was active in a rank-and-file organization called Teamsters for a Democratic Union. He solicited memberships in the group, organized meetings, and distributed literature on the organization's behalf.

5. There are at least nine separate incidents that support a conclusion of anti-union animus on the part of McLean, all denied by McLean: (1) In 1977, a terminal manager expressed "outrage" when Daniels, responding to an unfavorable grievance decision, remarked that "the only alternative would be to get better organized." (2) Later, that same terminal manager told Daniels that he would never get a shift as long as he was terminal manager. (3) In the summer of 1977, an assistant terminal manager refused to acknowledge receipt of a grievance filed by Daniels, and told Daniels that he was going to find a way to get rid of Daniels because of the large number of grievances Dan-

the evidence of unambiguous anti-union observations made with respect to Daniels justified a conclusion that there was anti-union animus and that it contributed to the attitudes of the employer toward the employee. McLean readily agrees to that much. The company conceded at oral argument that the General Counsel, on the basis of that evidence, made out a *prima facie* case of discriminatory discharge. Were that the entire matter, a simple affirmance of the Board's order to cease and desist directed against McLean would be our course.

There is additional evidence, though, making the case rather more complicated. McLean contends that, despite whatever anti-union animus it may have held toward Daniels, there was an independent good cause for discharging Daniels which in fact was the cause of the discharge. And to support its position, McLean points to a substantial body of evidence that demonstrates that Daniels was an unsatisfactory, or, to use the word employed by the administrative law judge, a "horrendous" employee. Beyond any real dispute here is the fact that Daniels was tardy or unexcusedly absent 31 percent of the time over a 36-month period,[6] and had accumulated a large array of reprimands and warnings.[7] Indeed, the ALJ, after taking note of that work record, candidly observed that the only viable conclusion would be that Daniels was discharged because he was a poor employee, and not because he was active in union and labor affairs.[8] Were that all there was to the matter, we would be compelled to swing to the other extreme and conclude that a refusal to enforce the Board's cease-and-desist order would be called for.

But, there is more—a third level of evidence and administrative action further

---

iels was filing. (4) On a number of other occasions, the assistant terminal manager "expressed extreme hostility" over Daniels' grievances, and persisted in refusing to acknowledge receipt of them. (5) In 1978, another terminal manager told Daniels that "McLean was a big company and they had ways to get rid of people like myself [Daniels] who thought they were lawyers." The manager threatened to "load [Daniels] up with paper. In other words, he could write as many [disciplinary] letters as [Daniels] could write grievances." (6) In December of 1978, the same manager, after a dispute with Daniels, told Daniels not to bother about filing a grievance because "it didn't really make any difference ... because ... he had the votes to get rid of [Daniels] at panel." (7) A fellow employee, in the process of filing some grievances, was asked by the manager whether "he was some kind of fanatic or something, about filing grievances." Although the employee never mentioned Daniels' name in that conversation, the manager made a point of doing so. (8) On another occasion, the same employee was told by the manager that "I used to be in the top ten percent of the employees ... and now I was in the bottom ten percent because I was hanging around with Carl Daniels and [another employee]." (9) Another employee, active with Daniels in Teamsters for a Democratic Union, was asked by a manager, during a disciplinary hearing, whether "I thought I was a Union activist like Carl Daniels."

6. Daniels was employed by McLean for approximately six years, but for much of that time Daniels was on lay-off status. Too, he was suspended for twelve and one-half days. All told, then, Daniels was in active, working service for McLean for about 36 months.

7. Daniels received 33 warning letters, alleging offenses ranging from unauthorized absence (nine occasions), failure to make himself available for work (three occasions), and "no call-no show" (twice), to unacceptable work habits (nine occasions), failure to follow instructions (six times), and failure to timely report an injury (once). Daniels also was cited once for participating in a sick-out. Finally, there are two warnings concerning Daniels' automobile use, matters which will be treated in more depth later in this opinion.

8. The ALJ wrote:

Respondent [McLean] has convincingly demonstrated that Complainant's [Daniels'] overall work-performance record amply justified his discharge. It is impossible to find that Respondent's action arose out of Mr. Daniels continuing exercise of protected rights ....

Complainant's long history of absences and tardiness, prior suspensions and warnings, all demonstrate a work record that is considerably less than exemplary.

Respondent has not exaggerated Complainant's weaknesses as an employee to justify his discharge.... In fact, Respondent had the opportunity to discharge Mr. Daniels at an earlier time, but refrained from doing so in response to promises on his part that he would become a productive employee and stop causing problems.

complicating the case. The collective bargaining agreement between McLean and the exclusive representative of its employees provides that a warning notice issued against an employee "shall not remain in effect for more than nine (9) months." The ALJ reasonably understood that language as a contractual bar against a discharge based upon stale wrongdoing, stale being anything more than nine months old.

As one might almost guess having read so far, the vast bulk of Daniels' wrongdoings were of the stale variety. What is more, his recent write-ups—those occurring during the nine-month period immediately preceding his discharge—were four in number and each and every one of a wholly trivial nature. Two raised productivity complaints, but, because McLean had no productivity standards, the two complaints did not figure in the company's deliberations leading to the discharge. The two grounds actually considered involved Daniels' use of automobiles. One, simply put, was a parking violation. The second charged use of an automobile in an unauthorized area. During a rainstorm, Daniels either drove a car upon, or was a passenger in a car which entered, the loading area at McLean's worksite. His goal was to avoid getting wet while he dropped in to pick up his weekly pay. As the ALJ concluded, and as we agree, the two automobile incidents would not, in and of themselves, warrant the dismissal of the typical McLean employee.

With the language of the collective bargaining agreement before him, the ALJ determined that he was completely interdicted from regarding the entire work record of Daniels in resolving the unfair labor practice charge. The ALJ took the position that he was permitted only to consider those matters in Daniels' file concerning his performance during the nine months preceding the discharge. Working from that premise, the ALJ deduced that there really was no good cause in support of the dismissal and that, consequently, the real reason must have been McLean's anti-union sentiments.

### III.

 The ALJ operated from a faulty premise. It was error to accord no weight whatsoever to the host of performance deficiencies Daniels exhibited prior to the nine-month period that preceded his discharge merely because the collective bargaining agreement directed McLean not to consider them.

The crucial question before the ALJ was one of McLean's actual motive. We may assume that McLean might stand in breach of the labor contract for considering and acting upon Daniels' stale warning notices, but it remains entirely probable that McLean in fact considered and acted upon those grounds, and on those grounds alone. In that case, anti-union animus did not motivate McLean. Its sole motive would have been to rid itself of a demonstrably poor worker. However wrongful, in the world of contract law, a discharge for those reasons might be,[9] the discharge would not implicate § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act because an anti-union animus would not have been "a factor" in McLean's decision.[10]

To have ruled out that probability, and to have given the evidence of Daniels' poor

9. It merits observation that the asserted wrongful discharge was taken to arbitration by Daniels where it was upheld as merited by poor performance.

10. An employer has the right to discharge an employee for any reason, whether it is just or not, and whether it is reasonable or not, as long as the discharge is not in retaliation for union activities or support.
*NLRB v. Ogle Protection Service, Inc.*, 375 F.2d 497, 505 (6th Cir.1967), *cert. denied,* 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967) (cited

with approval in *NLRB v. Consolidated Diesel Electric Co.,* 469 F.2d 1016, 1024 n. 21 (4th Cir.1972) ).
*See also Local 1424, International Association of Machinists v. NLRB,* 362 U.S. 411, 416–17, 80 S.Ct. 822, 826–27, 4 L.Ed.2d 832 (1960) ("earlier events may be utilized to shed light on the true character of matters occurring within the limitations period" for purposes of § 10(b) of the National Labor Relations Act, which establishes a six-month statute of limitations to govern unfair labor practice complaints).

overall performance no further consideration, solely on the basis of the labor contract's terms, was error, as the General Counsel forthrightly conceded at oral argument.

## IV.

The contention nevertheless is made that the court's mission is to review decisions reached by the Board, and not those made by an administrative law judge. And it is submitted by the General Counsel that the Board did in fact give consideration to Daniels' entire work record. The Board's observations in that respect were as follows:

> In the instant proceeding, Respondent [McLean] contends that Daniels was discharged for 6 years of misconduct. These defenses are clearly afterthoughts. Such shifting of defenses indicates that Daniels was discharged unlawfully.

As we see it, there is a difficulty of some magnitude in the approach taken by the Board. It appears verbally to avoid but, in fact, to repeat the error of the ALJ.[11]

Of course, what the Board did was to invoke the familiar proposition that an employer's recitation of different justifications to support a discharge at different points in time can, in certain circumstances, constitute "an affirmative and persuasive reason" for concluding that the asserted justifications never truly figured into the employer's actual decision to discharge the employee. *E.g., Jeffrey Manufacturing, supra,* at 948. *See also Taft Broadcasting Co.,* 238 N.L.R.B. 588 (1978). With that proposition in hand, the Board swept entirely aside, as did the ALJ for a different reason, Daniels' stale performance deficiencies and accorded them no further consideration.

Legal propositions in their abstract guise, however, should not be cited and applied indiscriminately because, not infrequently, they fail to take into account facts rendering the legalisms inapposite. The Board committed such an indiscretion when it branded McLean's resort to Daniels' overall work record a "shifting of defenses."

At the risk of overemphasis the question to be resolved is one of historical fact—the motivation of McLean at a certain fixed point in time. Where such an inquiry must be made, there is always the risk that it may be obstructed by *post hoc* rationalizations offered by an employer to clothe a discriminatory discharge in legitimacy. That is where the "shifting of defenses" proposition comes into play. On occasion, an employer's resort to several different justifications which change over time—the employer's inability to settle upon a coherent declaration of its motive, an historical fact only known to itself—is evidence from which a factfinder might infer that an established anti-union bias probably prevailed in the employer's mind. Unable to offer a consistent and coherent "good motive", the employer cannot complain if its vacillating defenses are rejected as inherently suspect. *See Jeffrey Manufacturing, supra; Taft Broadcasting, supra.*

No such inconsistency or vacillation renders McLean's position inherently suspect here, and therein lies the Board's error. To be sure, McLean did not verbally point to Daniels' long and storied work history when it first sought to discharge him. At the discharge hearing, where collective bargaining agreement considerations were paramount, the company limited its case, at least formally, to the automobile violations. As soon as the matter came under the auspices of the National Labor Relations Act, however, McLean stood resolute in its expression of the position that Daniels was fired because of his established poor performance. Whatever change in position McLean exhibited between the discharge hearing and the proceedings before the ALJ and the Board stands revealed as owing to the recognition that poor performance more

---

11. Thus, it should be clear that we by no means purport to accord judicial review to the ALJ's decision here. Exposition of the ALJ's error in method serves, rather, to illustrate the factual and legal setting as the case came on to the Board and to show, by way of contrast, a similar error underlying the decision of the Board—the body whose decisions we do have a duty to review.

than nine months old would be irrelevant in the discharge hearing but, properly viewed, quite cogent before the NLRB. It was a case of "coming clean" by McLean before the NLRB, to judge from the evidence we have before us, and not, as the Board concluded, the manufacturing of after-the-fact rationalizations. In short, it seems McLean might indeed have been motivated by Daniels' entire work record, but refrained from announcing that fact initially for fear of a consequent adverse conclusion in a subsequent contract grievance proceeding. Consistent with that view of the possibilities, an incentive to reveal the truth first arose once the prospect of an unfair labor practice charge ripened into a reality. We cannot overlook, in that vein, the fact that by time the unfair labor practice proceeding here developed, McLean had prevailed in a grievance proceeding brought by Daniels.[12] The point should not be overlooked that McLean's two positions were not mutually inconsistent. McLean could, mistakenly it turns out, but perfectly reasonably, rely on the recent deficiencies where it was contractually bound to do so, yet contend additionally (not contradictorily) that the peccadilloes more remote in time justified the discharge when the contract did not stand in the way.

The Board, then, committed in substance if not in form the same error committed by the ALJ. It failed to confront and grapple with a substantial body of evidence that tends to show that Daniels' discharge was not the product of a discriminatory motive. It summarily, for an inadequate reason, read out of the case evidence quite probative in nature.

We do not question the determination reached by both the Board and the ALJ that Daniels' most recent misbehavior—the automobile violations which occurred in the nine-month period immediately preceding the discharge—was wholly insufficient to justify the discharge. That misbehavior was a pretext masking some other, true, factor. The question left inadequately addressed by both the Board and the ALJ,

however, is what that other factor was. It could have been McLean's anti-union animus. But at least as likely, as the evidence now stands, it was McLean's decided intention to rid itself of a demonstrably poor worker at the earliest opportunity. While the recent misbehavior, viewed in isolation, may have been trivial, it could have been the straw that broke the camel's back.

### V.

Absent from the record, by virtue of both the ALJ's and the Board's failure to consider, with appropriate weight attached, the full extent of Daniels' work record, is the articulation of "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." *Firestone Tire, supra,* at 1337. Lacking is a supportable reason for the Board's conclusion that anti-union animus, rather than McLean's utter disenchantment with Daniels as a worker, prompted the discharge.

The General Counsel, accordingly, has failed, on the record before us, to carry the burden of proof.[13] We thus decline to enforce, but do so without prejudice to any determination by the NLRB to further pursue the unfair labor practice charge and to resolve, on an adequate basis, the decisive question of motive.

The Board's stated reason for rejecting McLean's asserted good cause was "all too easy to say." *Firestone Tire, supra,* at 1337. Without analysis of the subtleties presented by the case and without resort to a cogent reason derived from its expertise in labor-management relations, the Board simply incanted a legal aphorism—the "shifting of defenses" principle—that plainly has no bearing on the case at hand.

Perhaps on remand the Board will better articulate its rationale, finding reasons rooted in evidence or in its knowledge of labor relations and employer practices that would explain persuasively why McLean's asserted cause—which the ALJ accepted as proven, yet dismissed as

---

12. *See* n. 9, *supra.*

13. *See* n. 1, *supra.*

irrelevant [14]—should be disbelieved. Until the Board takes that step, however, we are obliged to deny enforcement. It is the Board's task to weigh conflicting relevant evidence, to apply its expertise, and to assign reasons for its decision. Our task is to review the decision of the Board in light of what it did and the grounds it has asserted in support of its decision, not in light of those things the Board might have done but did not do or those grounds the Board might have asserted but did not assert. *E.g., Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 1127, 4 L.Ed.2d 1208 (1960); *Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). We thus are not free to grant enforcement of the Board's order on the ground advanced by the dissenting opinion—that the Board reached a fair factual determination in the face of competing evidence. That is so because the Board, in fact, never did weigh the competing evidence. Instead, it effectively excluded from consideration, for a reason shown to be incorrect, relevant evidence supportive of the employer's position that the discharge was prompted by a lawful motive.

Because the Board has advanced no affirmative and persuasive reason in support of its action, we are constrained to deny enforcement.

ENFORCEMENT DENIED AND CAUSE REMANDED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. I cannot disagree with the majority's evidentiary summaries nor can I argue forcefully against most of my colleagues' statements of the relevant principles of law. If, as it appears, however, the majority would establish a new requirement of expressed specificity in the Board's weighing of the evidence, I would emphatically disagree. I also disagree with the majority's statement that "nothing turns" (in this case) on the *Wright Line* rule [1] shifting the burden of proof. The application of the law, by the majority opinion, moreover, misses the facts by a wide margin.

As the majority opinion correctly notes, our central task is one of reviewing the evidence—was there substantial evidence to sustain the Board in finding that Daniels was discharged solely because of his poor work record. It is true, as McLean contends, that there were legitimate reasons for which it could have discharged Daniels, but that is not the question. The issue is whether the discharge of October 9 was solely for such legitimate reasons or whether McLean's admitted animus against Daniels for his protected activities was a factor in his discharge.[2] McLean and the majority opinion concede that the General Counsel made a prima facie showing that "protected conduct" was a "motivating factor" in McLean's discharge decision. The sole issue then becomes whether McLean proved by a preponderance of the evidence that the discharge would have taken place even in the absence of the protected conduct. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

The Board made the following findings of fact: Daniels began his employment with

---

**14.** Thus, the dissent's statement that "there is no creditable evidence that Daniels' poor work record was the reason for his discharge" is not one with which the ALJ would express agreement. McLean, according to the ALJ, "convincingly demonstrated that Complainant's overall work performance record amply justified his discharge." The ALJ further determined from the record that McLean's discharge of Daniels could not possibly have arisen "out of Mr. Daniels continuing exercise of protected rights."

Nor has the Board discredited McLean's evidence of good motive in any way other than by invocation of the here inapplicable "shifting of defenses" principle.

**1.** *Wright Line,* 251 NLRB ¶ 17,356 (1980).

**2.** *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *See NLRB v. Kiawah Island Co.,* 650 F.2d 485, 490 (4th Cir.1981); *Neptune Water Meter Co. v. NLRB,* 551 F.2d 568, 569 (4th Cir.1977); *Wright Line,* a division of Wright Line, Inc., 251 NLRB 1083 (1980).

McLean in September, 1973.[3] He was employed as a dock worker, loading and unloading truck trailers at McLean's Cincinnati, Ohio, terminal. He later joined an organization known as Teamsters For A Democratic Union (TDU). He has served as co-chairman of the TDU Cincinnati Chapter since 1978. Daniels solicited memberships and organized meetings for TDU among McLean's employees. He distributed the regular TDU publication at various trucking terminals throughout Cincinnati, including McLean's terminal. Some of the articles in that publication raised questions concerning the legality of employment practices used by McLean, including activities at its Cincinnati terminal.

Daniels was extremely active in pursuing grievances against McLean alleging violations of its contract with the union. During the course of his employment, Daniels filed approximately 67 grievances, and achieved considerable success. In 1977, he was awarded two days' backpay by the local grievance panel for a three-day suspension imposed on him by McLean. Additionally, he was given six weeks' backpay in 1977 as the result of a settlement of a grievance concerning a seven-day suspension. Daniels also rendered assistance to other McLean employees in filing grievances, writing grievances for individual employees at their request. Some employees sought out Daniels rather than the union steward to assist them in filing grievances.

In early 1977, Daniels and another employee were processing a grievance involving call-in times for employees who did not have regular working hours. Daniels told then Terminal Manager Williams that, since the grievance procedure was not going to result in justice for those employees, the only alternative would be to become better organized. Williams became outraged and responded that Daniels would not be permitted to engage in that activity. Williams later told Daniels, in discussing a similar subject, that he would never receive a regular shift as long as Williams was the terminal manager.

During the summer of 1977, Daniels filed a grievance with Larry Pullen, assistant terminal manager, and requested Pullen to acknowledge receipt. Pullen told Daniels that he was going to find a way "to get rid of" him because he filed too many grievances. Pullen also stated that "grievance hearings would not have to be held but every three months if it wasn't for grievances that [Daniels had] filed, that [he had] filed too many grievances."

In November, 1978, Daniels had a conversation with then Terminal Manager Benny Keen. Keen told Daniels that McLean was a big company, and that it had ways "to get rid of" people like Daniels. Keen added that the Company could "load [Daniels] up with paper," writing as many disciplinary letters as Daniels could write grievances. In December, 1978, on the occasion when Daniels was sent home from work as a result of a dispute over whether he was wearing proper safety shoes, Keen told Daniels that he need not file a grievance because Keen had the votes "to get rid of" Daniels at the grievance panel.

Daniels was elected union steward at the McLean Cincinnati terminal on October 8, 1979, the day before he was discharged. As the ballots were being counted, Pullen, obviously upset by the tabulated results and likely outcome of the balloting, made several remarks derogatory to those employees who had voted for Daniels. After the ballot tabulation was concluded, Pullen remarked to the union officials that they should leave the ballot box in place because McLean was going to have a hearing on Daniels and discharge him the next day.

The discharge hearing on October 9, 1979, to which Pullen referred, had been scheduled first in August for September 4, 1979, but had been twice rescheduled because Daniels was on vacation and later due to

---

**3.** Daniels revealed at trial that his legal name is Ralph Wood. He applied for his job at McLean under the name of Daniels because he had been unable to obtain employment under his real name due to certain prior felony convictions. The Company, however, was unaware of this fact before the trial, and thus it had nothing to do with his discharge.

inadequate notice. At the hearing, which was conducted by Pullen, McLean relied on four disciplinary letters dated July 2, August 22, August 31, and September 21, 1979. The first two letters related to productivity, but because McLean had no established productivity standards, the union representatives objected to consideration of those letters and they were not considered.

The August 31 letter stated that Daniels' car had been parked in a reserved parking space between midnight and 5:00 A.M. Daniels admitted at the unfair labor practice hearing that he had parked in a parking space reserved for office personnel, but credibly testified that Pullen had given employees oral permission to park in reserved spaces during hours when they were not occupied by the individuals for whom the spaces were reserved.

The letter of September 21 concerned another parking violation. Daniels, who was on vacation, drove to the terminal at night to pick up his pay check, and drove into a restricted area. Although Daniels admitted having his car in the restricted area, he stated that it was raining heavily and he entered the area to get his pay check without getting wet. At the unfair labor practice hearing, Pullen testified that Daniels' appearance in this restricted area (close to where several employees were working) led to a work stoppage. However, there was no mention of a work stoppage resulting from this incident at the October 9 discharge hearing. None of the other employees were shown to have been disciplined for stopping work on that occasion.[4]

This mass of detail was included in the Board's finding of fact. In the face of these findings, how can it be argued that the Board did not weigh the evidence. To require a more detailed finding or statements by the Board expressly weighing one item of evidence against the other would impose requirements of formalistic ritual on the Board's opinion writing, which is not only contrary to precedent[5] but is unnecessary to considered appellate review.

The Board's finding that McLean violated sections 8(a)(3) and (1) was based on the October 9 discharge. The majority concedes that the only reasons assigned by McLean for the discharge were two "trivial" work rule violations. Daniels' explanations for his actions were credited by both the ALJ and the Board. In view of this, it is impossible to ignore the unusually large accumulation of anti-union animus evidence. The Board thus correctly decided that the General Counsel made a prima facie showing that anti-union animus at least contributed to McLean's decision to discharge Daniels. *See NLRB v. Transportation Management Corp., supra; NLRB v. Kiawah,* 650 F.2d 485; *Neptune Water Meter Co. v. NLRB,* 551 F.2d 568.

The first time McLean recited Daniels' poor work record as a reason for his discharge was at the unfair labor practice hearing. Crucial to our decision is the time when McLean formed its intentions to discharge Daniels. The Board correctly determined that it must consider McLean's motivation as it existed at the time of the discharge, not as it existed at the time of the unfair labor practice hearing. It is conceded that the only evidence bearing on McLean's motivation on October 9, the date of discharge, was McLean's admissions that it relied only on the two "trivial" reasons. There was no mention of a poor work record. Against the background of overt anti-union animus, this assumes even greater significance.

The majority apparently believes that, although McLean advanced only trivial reasons for the discharge on October 9, McLean silently relied only on Daniels' poor work record. I can understand that McLean offi-

---

4. To protest his discharge of October 9, Daniels filed a grievance, which became deadlocked at the local panel. The grievance then was heard by the state panel in Columbus, Ohio, which upheld the discharge. It was at the latter hearing that the Company first claimed that Daniels' parking violation of September 14 (for which the September 21 disciplinary letter was issued) created a work stoppage.

5. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

cials may have maintained such a reason in secrecy due to the contract's inhibitions. I do not understand, however, that, in the absence of inconsistent testimony, the Board or its functionaries have a duty to *sua sponte* probe the subconscious of witnesses, and there was no inconsistent testimony at the discharge hearing. In any event, while there is considerable evidence that Daniels had a poor work record, there is no creditable evidence that Daniels' poor work record was the sole reason for his discharge. Certainly, McLean did not prove by a preponderance of the evidence that Daniels would have been fired for permissible reasons even absent his protected union activities. *See Transportation Management, supra; NLRB v. Kiawah Island Co., supra.* The majority, in the face of this, holds that the General Counsel failed to carry the burden of proof. It is respectfully submitted that this misses the impact of *NLRB v. Transportation Management Corp., supra.* The *Wright Line* rule, adopted by the Supreme Court in *Transportation Management Corp.* not only shifts the burden of production, but, unlike *Burdine*,[6] the actual burden of proof is shifted. The critical issue here was whether the discharge of Daniels was solely for permissible reasons or was motivated, in part, by McLean's hostility towards Daniels' protected conduct. The burden of proof as to the critical issue here, was not on the General Counsel, but on McLean. The Board found that McLean did not meet his burden. And there is more than substantial evidence to support that finding. Not only did the Board consider the voluminous evidence of anti-union animus, but there was substantial evidence upon which the Board properly inferred that Daniels' admitted poor work record did not enter into the discharge decision.

The majority points out that parties by private contract cannot affect the law governing unfair labor practices. That may be true, but it does not follow that the contract is not a fact to be considered in applying principles of labor law. The discrete fact sought to be ascertained was McLean's motive. The Board found that animus against protected activity was a primary motive. It also found that whatever other reasons McLean might have had were shaped by the contract—that is, knowing that in discharging Daniels it was limited to incidents occurring in a nine-month period McLean tailored its reasons accordingly. Regardless, the two "trivial" reasons were the only reasons given on October 9 for discharge, and there is more than substantial evidence to support the Board's finding that anti-union animus was a major consideration in McLean's decision to fire Daniels.

The majority notes the ALJ's stated belief that the contractual nine-month limitation legally restricted the reasons McLean could advance for Daniel's discharge. The Board emphasized a different view, however, stressing that it only viewed the contract as a link in the chain of facts establishing McLean's motivation. It is the Board which is the finder of fact and it is their decision which we review, not that of the ALJ.[7] The majority recognizes that general rule, then ignores it in application.

In my mind, the majority opinion completely emasculates the "substantial evidence" rule by minutely weighing the evidence relating to McLean's motivation and viewing the scales from an improper judgmental perspective. I would grant enforcement.

**6.** *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**7.** *Jeffrey Manufacturing Div. v. NLRB,* 654 F.2d 944, 948 (4th Cir.1981); *Kiawah,* 650 F.2d at 489.